603 F.Supp. 1099 (1985)
MIDWEST PETROLEUM COMPANY, Plaintiff,
v.
AMERICAN PETROFINA, INCORPORATED, and American Petrofina Marketing, Inc., Defendants.
No. 83-93C(1).
United States District Court, E.D. Missouri, E.D.
March 5, 1985.
*1100 *1101 *1102 *1103 James P. Tierney, Alfred R. Hupp, Jr., Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., and Paul Brackman, Thomas G. Brackman, Brackman, Copeland, Oetting, Copeland, Walther & Schmidt, Clayton, Mo., for plaintiff.
Kenneth R. Heineman, Ellen E. Bonacorsi, Coburn, Croft & Putzell, St. Louis, for both defendants.

MEMORANDUM
NANGLE, Chief Judge.
This case is now before this Court on plaintiff's motion for partial summary judgment. For the reasons stated infra, plaintiff's motion is granted in part and denied in part.

I. OVERVIEW OF PLEADINGS
Plaintiff Midwest Petroleum Company's (hereinafter "Midwest") cause of action arises out of the Petroleum Marketing Practices Act (hereinafter "PMPA"), 15 U.S.C. §§ 2801-2806, 2821-2824, 2841, and other federal statutes that regulate the purchase and sale of petroleum products.[1] *1104 Plaintiff's one-count complaint alleges that defendants violated the PMPA by refusing to offer to transfer or assign to Midwest defendants' interests in certain leases and sub-leases of retail gas stations. Plaintiff further alleges that defendants wrongfully offset rents allegedly due defendants against payments due Midwest under a Consent Order between the Department of Energy (hereinafter "DOE") and defendants. Plaintiff seeks $150,000.00 in actual damages and exemplary damages in the amount of $250,000.00.
Defendants' answer asserted several affirmative defenses and counterclaims. Both defendant American Petrofina Marketing, Inc. (hereinafter "APMI") and defendant American Petrofina, Incorporated (hereinafter "API") asserted the following affirmative defenses: 1) that defendants' conduct was permitted by the PMPA; 2) that plaintiff suffered no injury as a result of defendants' allegedly illegal conduct; 3) that plaintiff's action is barred by the PMPA statute of limitations; 4) that plaintiff's action is barred by the doctrines of waiver, estoppel and laches; and 5) that plaintiff's action is barred by a valid release. APMI asserted the additional defense of setoff and API asserted the additional defense of lack of personal jurisdiction.[2] AMPI also responded with a three (3)-count counterclaim, each count of which rests on a breach-of-lease theory. Count I alleges that rent is due but unpaid under five (5) service station leases. Count II alleges that plaintiff breached its obligation to keep several leased service stations in good repair. Count III alleges that plaintiff is liable under several service station leases for property taxes and penalties paid by APMI.
Plaintiff filed the instant motion for summary judgment, seeking summary judgment on the issue of defendants' liability as alleged in plaintiff's complaint, as well as the validity of several of defendants' affirmative defenses.

II. STANDARD FOR SUMMARY JUDGMENT
Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In passing on a motion for summary judgment, a court is required to view the facts and inferences that may be derived therefrom in the light most favorable to the non-moving party. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983); Vette Co. v. Aetna Casualty and Surety Co., 612 F.2d 1076, 1077 (8th Cir.1980). The burden of proof is on the moving party and a court should not grant a summary judgment motion unless it is convinced that there is no evidence to sustain a recovery under any circumstances. Buller, 706 F.2d at 846. However, under Rule 56(e), a party opposing a motion for summary judgment may not rest upon the allegations of his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). See also 10A Wright, Miller and Kane, Federal Practice and Procedure: Civil 2d, § 2739 (1983).

*1105 III. FACTS
Midwest is a Missouri corporation having its principal place of business in St. Louis, Missouri. Midwest purchases gasoline for resale both to the wholesale market and the general public in the St. Louis, Missouri, area. Midwest also leases service station premises to independent dealers and operates stations itself. API and APMI are Delaware corporations having their principal places of business in Dallas, Texas. It is undisputed that APMI is qualified to and is doing business in the State of Missouri. American Petrofina Company of Texas (hereinafter "APCOT") is a wholly-owned subsidiary of API. APCOT owns sixty percent (60%) and API owns forty percent (40%) of the stock of APMI. APMI, since its creation on or about December 20, 1979, sells petroleum products through a branded program. APCOT refines and sells petroleum products.
On or about January 7, 1959, Midwest and APCOT entered into a "Jobber Sales Contract" (hereinafter "JSC"), effective January 15, 1959. The JSC provided that Midwest was to purchase petroleum products from APCOT and APCOT was to sell petroleum products to Midwest. The contract specified the minimum quantity that Midwest was required to buy and the maximum quantity that APCOT was required to sell. Included in the JSC was a license for Midwest to sell, distribute, and job petroleum products under the brand name "Fina." The JSC required Midwest to sell products purchased under the JSC only under the "Fina" name. After the expiration of its initial term, the JSC was renewed annually pursuant to the automatic renewal provisions contained therein and continued in effect until 1982. As part of its branded program, which included the JSC with Midwest, APCOT instituted "Fina" advertising programs and made a credit card program available to its jobbers, including Midwest. To this end, on August 1, 1969, APCOT entered into a "Fina Credit Card Service Agreement" with Midwest. Under this agreement, APCOT accepted Midwest's sales tickets representing credit card sales and credited Midwest's account for the value thereof. By an instrument dated December 20, 1979, APCOT assigned the JSC to APMI. At that time, APMI also undertook APCOT's other obligations associated with the branded program, but APCOT performed several accounting functions for APMI.
During the period between 1959 and 1982, Midwest's dealings with APCOT and APMI also consisted of various service station leasing arrangements.[3] In 1962, Midwest sub-leased from APCOT the service stations located at 3655 California, St. Louis, Missouri (hereinafter "California station"), and at Manchester Road, Pond, Missouri (hereinafter "Manchester station"). In 1969, Midwest leased from APCOT the service station located at I-70 and Natural Bridge Road in Edmundson, Missouri (hereinafter "Airport station"). In 1971, Midwest leased from APCOT the service station at Second and Broadway in Mount Vernon, Illinois (hereinafter "Mount Vernon"). Also in 1971, Midwest subleased from APCOT the following six (6) service stations, collectively known as the "Fischer Fleet" stations: 1) 9855 Halls Ferry Road, St. Louis County, Missouri (hereinafter "Halls Ferry station"); 2) 8455 Gravois Road, St. Louis County, Missouri (hereinafter "Gravois station"); 3) 1310 Lemay Ferry Road, St. Louis County, Missouri (hereinafter "Lemay station"); 4) 2815 Woodson Road, Overland, Missouri (hereinafter "Woodson station"); 5) 6525 Page Avenue, Pagedale, Missouri (hereinafter "Page station"); and 6) 7001 South Lindbergh, St. Louis County, Missouri (hereinafter "Lindbergh station"). In 1972, Midwest sub-leased from APCOT the service station located at 1617 South Florissant, Cool Valley, Missouri (hereinafter "South Florissant station"). Finally, in 1980 Midwest *1106 sub-leased from APMI[4] the service station located at 1069 Gravois, Fenton, Missouri (hereinafter "Fenton station"), and leased from APMI the service station at I-70 and Missouri Highway 161, Danville, Missouri (hereinafter "Danville station"). Thus, as of August 21, 1981, Midwest was leasing or sub-leasing thirteen (13) station sites from APMI.
The terms of all the service station leases and sub-leases were, for the most part, uniform. Like the JSC, the leases and sub-leases licensed Midwest to use the Fina name in connection with sales of petroleum products purchased from APMI.[5] Unlike the JSC, the lease and sub-leases did not require APMI to sell or Midwest to buy petroleum products. None of the sub-leases, nor the lease, mentions or refers to the JSC. However, nothing in the leases or sub-leases prevented Midwest from selling at the various station sites petroleum products purchased from distributors other than APMI. Said instruments prevented Midwest only from selling under the "Fina" brand petroleum products purchased from distributors other than APMI.
During the period between 1959 and 1976, Midwest purchased considerable amounts of gasoline from APCOT. However, Midwest's purchases under the JSC dropped off gradually between 1976 and 1978 and then dropped off sharply through 1981. The quantities purchased for the years 1974 through 1981 were, as follows:

 1974  50,300,812 gallons
 1975  58,063,123 gallons
 1976  54,630,319 gallons
 1977  43,564,703 gallons
 1978  38,902,026 gallons
 1979  30,093,532 gallons
 1980  28,414,719 gallons
 1981  9,623,075 gallons

During 1980 and 1981, Midwest purchased gasoline from other suppliers in addition to purchasing gasoline under the JSC. From mid-1980 through 1981, APMI expressed its discontent to Midwest over the amount of gasoline Midwest was purchasing from APMI,[6] and Midwest expressed to APMI its discontent over the price of gasoline to Midwest. In May, 1981, APMI discussed with Midwest the possibility of a mutual cancellation of the JSC. Midwest refused and indicated that it would purchase only enough gasoline to cover its Fina credit card purchases. Apparently, it was Midwest's desire to keep its Fina signs and credit cards and Midwest could achieve this result by buying from APMI only enough gasoline to match its credit card sales. This would effectively allow Midwest, despite the language of the leases and subleases, to sell other suppliers' products under the Fina brand. In July, 1981, employees of APMI advised Midwest that the JSC would be cancelled effective January, 1982. On or about September 2, 1981, APMI personally delivered to Midwest a letter dated August 21, 1981. Said letter provided, in pertinent part, as follows:
APMI, as Seller, acting in good faith and in the normal course of business, has made a determination that a renewal of the contractual relationship provided for *1107 in the Contract would be uneconomical and this letter is notice to you that pursuant to paragraph # 2 of the Contract, APMI, as Seller, terminates and cancels said Contract, effective as of midnight January 14, 1982.
Enclosed is a copy of the summary of Title I of the Petroleum Marketing Practices Act, Pub.L. 95-297.
In addition, APMI sent Midwest a letter dated October 13, 1981, which notified Midwest that APMI had determined that it was economically unfeasible to continue the lease for the Airport station and that it had therefore elected to cancel the lease effective March 31, 1982.
Faced with the loss of a supplier, on November 2, 1981, Midwest entered into a supply contract with Sun Refining and Marketing Company. Midwest then sent a letter dated November 17, 1981, to APMI. In said letter, Midwest advised APMI, in pertinent part, as follows:
[U]nder the Petroleum Marketing Practices Act the notice [of termination of the JSC] terminates the franchise relationship; and ... the franchise underlying that relationship include [sic] our leases with you, ... the right to sell under the Fina brand is a basic part of the leases, and ... the leases as well as the [JSC] have thereby been terminated as of January 14, 1982.
However, in the same letter, Midwest purported to exercise its alleged right under § 2802(b)(3)(D)(iii) of the PMPA to receive a "bona fide offer to sell or assign [APMI's] interest in the franchised premises to" Midwest. Midwest then requested APMI to assign to Midwest the prime leases on the South Florissant, Lindbergh and Gravois stations and to sell or continue leasing to Midwest the Airport station.[7] Midwest's letter made no mention of any other service station sites. APMI responded with a letter dated November 30, 1981, in which APMI demanded that Midwest honor all existing service station leases and reaffirmed the fact that the Airport lease would be terminated effective March 31, 1982.
After November 2, 1981, until January 14, 1982, APMI sold gasoline to Midwest and Midwest continued to purchase gasoline from APMI. APMI did not sell any motor fuel to Midwest subsequent to January 15, 1982. The Danville station lease was mutually cancelled on August 31, 1981. The Mount Vernon station sub-lease was mutually cancelled on June 23, 1983. Midwest paid rent under the Airport lease through March 31, 1982, but it did not pay any rent on said lease thereafter. On April 1, 1982, Midwest surrendered possession of the Airport station to APMI. From and after January, 1982, Midwest stopped paying rent on the following Fischer Fleet stations: the Halls Ferry, Gravois, Lemay, Woodson and Page[8] stations. However, after January, 1982, Midwest obtained insurance for those five (5) Fischer Fleet stations and Midwest cashed checks representing rental payments to Midwest in the amount of $1,800.00 on the Woodson station on or about October 26, 1982, November 11, 1982, and January 5, 1983. Defendants allege that the Fischer Fleet stations have fallen into disrepair. As for the Lindbergh, South Florissant, and Fenton stations, Midwest paid rent, insurance and taxes thereon through the present and, in fact, sub-leased said stations to third parties. Midwest sells gasoline under the "Sunoco" brand at said stations.[9]
*1108 On March 2, 1982, API executed a Consent Order with the United States Department of Energy, which Consent Order became effective on May 6, 1982. This Consent Order was intended to resolve all civil and administrative claims and disputes arising from federal petroleum price and allocation regulations for the period January 1, 1973, through January 27, 1981. Although API was referred to in the Consent Order as "Fina", the Order specifically provided that "[r]eferences ... to Fina include (without limitation) its subsidiaries, [and] affiliates. ..." Under the Consent Order, API, as "Fina", agreed to make payments totalling $14,000,000.00, in full and final settlement of all matters covered by the Consent Order, to jobbers who had purchased gasoline from APCOT in 1974. The payments were to be made in three (3) installments, the last of which was due on December 31, 1982. The Consent Order provided that "Fina shall pay, by check or credit memorandum" the monies due each jobber.
In connection with the Consent Order, on May 12, 1982, API mailed to Midwest in Missouri, in accordance with the Consent Order, a "Notice of Offer of Payment Pursuant to DOE Consent Order", along with an unexecuted release. Prior thereto, APMI had sent a letter to Midwest describing the terms of the Consent Order. By the May 12, 1982, document, API offered to pay $645,255.52 to Midwest. The document provided a method of acceptance, as follows:
To accept this offer Midwest Petroleum Company must execute and return to Fina the attached release of any and all claims against Fina under the federal petroleum price and allocation regulations. Under the Consent Order, this release must be received by Fina not later than June 20, 1982.
However, it also provided, as follows:
[U]pon request by Fina, the person or firm returning the release must provide Fina not later than July 20, 1982, with proof or assurances satisfactory to Fina that the person or firm returning the release is, in fact, a qualifying jobber as defined in the Consent Order and that the release tendered is authorized and effective in accordance with its terms.
If Fina does not receive the executed release by June 20, 1982, or if Fina does not receive proof or assurance satisfactory to Fina that the person or firm returning the release is, in fact, a qualifying jobber as defined in the Consent Order and that the release tendered is authorized and effective in accordance with its terms, by July 20, 1982, Fina shall have no obligation to make any payment to or in respect of Midwest Petroleum Company but shall instead pay its share to the United States Treasury.
On May 28, 1982, Midwest executed in Missouri the release which accompanied the "Notice of Offer of Payment Pursuant to DOE Consent Order" and sent a letter to APMI accepting Fina's offer of payment. Midwest also provided APMI with a certified copy of the Board of Directors' resolution authorizing the release and acceptance, a photocopy of a December, 1981 invoice from APMI. In the release, Midwest agreed to "remise, remit and forever discharge" API and APMI, inter alia, for "any and all claims, causes of action, actions, judgments, damages, ...." against them arising under the Economic Stabilization Act of 1970 and the Federal Petroleum Allocation Regulations up to the date of May 28, 1982.
Three (3) timely payments were thereafter made to Midwest under the Consent Order. APCOT actually made the payments, but the stub of each check recited that it was in payment of an obligation of APMI. The amount of the first installment, due Midwest in July, 1982, was $215,085.17. As of July 22, 1982, Midwest's account with APMI had a debit balance of $83,225.64, of which $67,790.79 represented accrued and unpaid rents for the five (5) Fischer Fleet service stations. The check actually sent to Midwest was in the amount of $156,734.03 and represented the difference *1109 between the amount of the first installment and Midwest's debit balance. The amount of the second installment, due Midwest in August, 1982, and the amount of the final installment, due Midwest in December, 1982, were both $215,085.17. The checks actually sent to Midwest were for $200,334.67 and $178,679.25, respectively. The amounts of the checks represented the differences between the amounts due under the Consent Order and Midwest's debit balances in its account with APMI, which debit balances represented accrued and unpaid rent for the five (5) Fischer Fleet stations. Midwest deposited all of these checks without protest.
On January 3, 1983, within days after APCOT's third check was drawn, Midwest filed the instant action against API and APMI.

IV. DISCUSSION
Midwest seeks partial summary judgment on the issues of defendants' liability and the validity of defendants' affirmative defenses. Midwest's motion does not go to the amount of damages or the merits of APMI's counterclaims. This Court will discuss defendants' affirmative defenses first and then treat the merits of plaintiff's complaint.

A. AFFIRMATIVE DEFENSES

1. Failure to Comply With PMPA
Defendants' first affirmative defense to plaintiff's complaint is that plaintiff failed to comply with the PMPA. Midwest did not specifically address this defense in its motion for partial summary judgment. Defendants argue that this omission precludes partial summary judgment in plaintiff's favor. It is true that the existence of a single, triable affirmative defense may preclude summary judgment for plaintiff on the merits, but the flaw in defendants' argument is its assumption that defendants may rest on their pleadings in the face of a motion for summary judgment. "[T]he party opposing the summary judgment motion does not have the right to withhold his evidence until trial; nor can he demand a trial because of the speculative possibility that a material issue of fact may appear at that time." 10A C. Wright, A. Miller, and M. Kane, Federal Practice and Procedure: Civil 2d § 2739 at 521-22 (1983). Indeed, in some circumstances, a party opposing a motion for summary judgment has a burden of producing evidence. Id., § 2727 at 143-44. Imposing such a burden on a defendant opposing a motion for summary judgment is especially appropriate where the issue is one on which said defendant would bear the burden of proof at trial. This burden is not a heavy one; the nonmoving party "simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." Id. at 148.
In the case at bar, the record does not indicate how plaintiff failed to comply with the PMPA. Defendants do not point out to this Court where, in the present record, there is evidence that plaintiff failed to comply with the PMPA. Defendants do not argue that there is evidence, not contained in the present record, which creates an issue of fact concerning plaintiff's compliance with the PMPA. Moreover, neither defendants' answer to the complaint nor defendants' memoranda in opposition to the instant motion specify what provisions of the PMPA Midwest was required to comply with or failed to comply with. Under these circumstances, defendants fail to demonstrate that this particular affirmative defense presents "a genuine issue worthy of trial." Id. Accordingly, Midwest's failure to address this defense in its motion does not preclude a ruling in its favor on said motion.

2. Lack Of Actual Damages
Defendants also argue that a ruling for Midwest on its motion is inappropriate because Midwest failed to address defendants' affirmative defense to the effect that Midwest has not suffered any actual damages. The simple answer to defendants' argument is that plaintiff's motion is not addressed to the issue of damages, but *1110 only to the issue of liability and lack of actual damages is not a complete defense to liability. The PMPA provides for the recovery of punitive and nominal damages and, thus, authorizes relief even in the absence of actual damages. 15 U.S.C. § 2805(d)(1)(B) and (C). This affirmative defense does not preclude partial summary judgment for plaintiff and said defense will be addressed if, and when, the issue of damages is ripe for decision.

3. Statute of Limitations
The PMPA statute of limitations is found in the section entitled "Enforcement provisions" and provides, in pertinent part as follows:
[N]o such action may be maintained unless commenced within 1 year after the later of 
(1) the date of termination of the franchise or nonrenewal of the franchise relationship; or
(2) the date the franchise fails to comply with the requirements of section 2802 or 2803 of this title.
15 U.S.C. § 2805(a). Failure to bring an action under the PMPA within this period will forever bar a plaintiff from asserting his rights under the PMPA. Ames v. Texaco, Inc., 568 F.Supp. 1317 (W.D.Mich.1983). The present action was commenced on January 13, 1983. The issue in dispute is when, for purposes of applying the one (1) year period of limitations, did the period begin to run? Defendants argue that the statute is silent on the question of accrual and that this Court should apply the "general federal rule ... that a limitations period begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action." Trotter v. International Longshoremen's and Warehousemen's Union, Local 13, 704 F.2d 1141, 1143 (9th Cir.1983). Applying the knowledge rule here, defendants argue that plaintiff's action accrued no later than September 2, 1981, the date Midwest received the letter from APMI which informed Midwest that the JSC would terminate effective January 14, 1982.
In the opinion of this Court, the knowledge rule is inapplicable because the terms of § 2805(a) expressly define the alternative dates on which the one (1)-year period begins to run. Section 2805(a)(1) appears to provide the later of the two (2) dates here. The statute also defines the terms used in § 2805(a)(1). "The term `termination' includes cancellation." 15 U.S.C. § 2801(17). "The terms `fail to renew' and `nonrenewal' mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship  (A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise." 15 U.S.C. § 2801(14). Defendants' suggestion that the PMPA's definitions of terms that are used in the limitation provision are irrelevant to interpreting and applying the limitation period is ludicrous. Applying those definitions and § 2805(a)(1) to the facts of this case, it is clear that the one (1)-year period began to run on January 14, 1982, the date the JSC was cancelled, terminated, and concluded. Accordingly, defendants' statute of limitations defense is rejected.

4. Personal Jurisdiction Over API
Defendant API separately asserts the defense that this Court lacks personal jurisdiction over it. This Court treats API's assertion of this defense as a motion to dismiss.
In passing on a motion to dismiss for lack of jurisdiction over a non-resident, a federal court is required to engage in a two-step inquiry: first, whether defendant committed one of the acts enumerated in the long-arm statute; and second, whether the exercise of personal jurisdiction over defendant violates the due process clause of the fourteenth amendment. The Land-O-Nod Company v. Bassett Furniture Industries, Inc., 708 F.2d 1338 (8th Cir.1983); Scullin Steel Co. v. National Railway Utilization Corp., 676 F.2d 309, 312 (8th Cir.1982). Plaintiff, the party that is seeking to invoke federal jurisdiction, has the burden of establishing that jurisdiction exists, and this burden may not be shifted to *1111 the party challenging the jurisdiction. Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 653 (8th Cir.1982). While the facts are viewed in the light most favorable to the plaintiffs, "there must nonetheless be some evidence upon which a prima facie showing of jurisdiction may be found to exist ...." Aaron Ferer & Sons Co. v. Diversified Metals Corp., 564 F.2d 1211, 1215 (8th Cir.1977) (citations omitted). See also Data Disc, Inc. v. Systems Technology Associates, Inc., 557 F.2d 1280, 1285 (9th Cir.1977) (plaintiff need only make a prima facie showing of jurisdictional facts through submission of affidavits plus discovery materials); Greycas, Inc. v. Anderson, 584 F.Supp. 894, 895-96 (E.D. Mo.1984); 4 Wright & Miller, Federal Practice and Procedure: Civil § 1068 at 250 (1969).
Missouri's Long-Arm statute provides:
1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any such acts:
(1) The transaction of any business within this state;
(2) The making of any contract within this state;
(3) The commission of a tortious act within this state;
(4) The ownership, use, or possession of any real estate situated in this state;
(5) The contracting to insure any person, property or risk located within this state at the time of contracting.
2. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.
§ 506.500, R.S.Mo. (1982).
The due process clause of the fourteenth amendment places limits upon the power of a court to exercise personal jurisdiction over a non-resident defendant. The due process clause requires that a defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); Land-O-Nod, 708 F.2d at 1340. Accord World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); Kulko v. California Superior Court, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). "In judging minimum contacts, a court properly focuses on `the relationship among the defendant, the forum, and the litigation.'" Calder v. Jones, ___ U.S. ___, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (citations omitted). See also Helicopteros Nacionales de Colombia S.A. v. Hall, ___ U.S. ___, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). The defendant's contacts with the forum state must be purposeful and such that defendant "should reasonably anticipate being haled into court there." World Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. at 567. See also Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).
In this circuit, the due process standard has devolved into a consideration of five factors:
(1) the nature and quality of the contracts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contracts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.
Aaron Ferer & Sons Co. v. Diversified Metals Corp., 564 F.2d 1211, 1215 (8th Cir. 1977). See Land-O-Nod, 708 F.2d at 1340. The first three factors are of primary importance and the last two are of secondary importance. Id.
In the case at bar, there are two (2) theories under which API might be subject to service of process under Missouri's *1112 long-arm statute. The first theory is that API made a contract with Midwest in Missouri because API sent the "Notice of Offer of Payment Pursuant to DOE Consent Order" to Midwest in Missouri and Midwest accepted it in Missouri. This Court believes that API was subject to long-arm service of process under this theory. A contract is made where the offer is accepted. Servco Equipment Co. v. C.M. Lingle Co., 487 S.W.2d 869, 870 (Mo.Ct. App.1972). This Court rejects API's argument that the contract was not "made" until API received the executed release and proof that Midwest was a qualifying jobber. While the offer could not be accepted without returning an executed release and proof that Midwest was a qualifying jobber, the contract was made in Missouri when Midwest put the required documents into the mail. Id.
The second theory of long-arm jurisdiction is that API was transacting business in Missouri through its subsidiary, APMI. Although a parent will not be subject to service of process in a particular forum merely because its subsidiary does business in that forum, Cannon Manufacturing Co. v. Cudahy Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Graco, Inc. v. Kremlin, Inc., 558 F.Supp. 188, 190-91 (N.D.Ill.1982), ownership of a subsidiary that does business in a forum can confer jurisdiction on a parent when the parent actively participates in the operations of the subsidiary. Stith v. Manor Baking Co., 418 F.Supp. 150, 154 (W.D.Mo.1976); Hitt v. Nissan Motor Co., 399 F.Supp. 838, 850 (S.D.Fla.1975). In determining whether a parent is sufficiently separate from its subsidiary for jurisdictional purposes, a court focuses on the following factors:
whether the parent arranges financing for and capitalization of the subsidiary; whether separate books, tax returns and financial statements are kept; whether officers or directors are the same; whether the parent holds its subsidiary out as an agent; the method of payment made to the parent by the subsidiary; and how much control is exerted by the parent over the daily affairs of its subsidiary.
Graco, Inc., 558 F.Supp. at 191. In the opinion of this Court, this second theory of long-arm jurisdiction must be rejected because Midwest failed to make a prima facie showing that API actively participates in the operations of APMI in terms of the factors enumerated above.
Having determined that API was subject to the Missouri long-arm statute, under a theory of making a contract in Missouri, this Court must next determine whether the assertion of personal jurisdiction over API comports with due process. In the opinion of this Court, it does not. API's contact with Missouri in this case is limited to mailing the "Notice of Offer of Payment Pursuant to DOE Consent Order" to Midwest in Missouri. The subsequent contacts, i.e., sending the payment checks and credit memoranda to Midwest, were made by APCOT and APMI, not API. The nature, quality and quantity of API's contact with Missouri are not such that API should "reasonably anticipate being haled into court" in Missouri. World Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. at 567. In addition, Midwest's cause of action is not directly related to API's contact with Missouri. The gravamen of plaintiff's complaint is that APMI violated the PMPA by not offering to assign various prime leases to Midwest following the alleged termination of the franchise relationship. Plaintiff's claim against API is essentially that it was a breach of API's contract with Midwest to debit the amounts due thereunder with rent allegedly due under the subleases. However, as discussed infra, the Consent Order permitted such an offset if a qualifying jobber owed money to API. Accordingly, the key issue is not whether API breached the contract by debiting the amounts due under the Consent Order, but whether Midwest actually owed APMI the debit balance reflected in the account. This is a PMPA issue that is not directly related to API's contact with Missouri. Moreover, the interest of Missouri in providing a forum for its residents is not *1113 harmed because Midwest can obtain complete relief, if appropriate, from APMI.
In sum, API's contact with Missouri is limited to a single mailing. Midwest has not made a sufficient showing that API, APMI and APCOT disregard their corporate separateness to justify treating APMI's contacts as API's contacts. Here, API's contact with Missouri is insufficient to satisfy the requirements of due process and API is dismissed as a party defendant. T.J. Raney & Sons, Inc. v. Security Savings & Loan Association of Salina, Kansas, 749 F.2d 523, 525 (8th Cir.1984) (use of mail and telephone, standing alone, is insufficient to satisfy requirements of due process).

5. Laches
The doctrine of laches is the equitable counterpart of the statute of limitations defense. Defendants argue that plaintiff's action should be barred because Midwest delayed unreasonably in filing this action and that said delay resulted in undue prejudice to defendants.
The purpose of the doctrine of laches is to avoid unfairness which can result from the prosecution of stale claims. Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 805 (8th Cir.1979), cert. denied, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980). Two elements must be satisfied to apply the doctrine: 1) unreasonable delay in filing suit; and 2) undue prejudice to a defendant caused by said delay. Hurst v. United States Postal Service, 586 F.2d 1197, 1199 (8th Cir.1978). In the case at bar, neither element is satisfied.
Defendants argue that the delay in this case was unreasonable, because this action was not filed within the applicable period of limitations. Aside from the fact that the doctrine of laches should not even apply if an action is barred by the applicable period of limitations, this argument is rejected because this Court holds, supra, that the period of limitations had not expired when plaintiff filed this case. Moreover, the delay was reasonable because it was caused, in part, by the timing of the Consent Order payments and APMI's withholding of the amounts allegedly due for rent.
Defendants argue that they suffered undue prejudice as a result of plaintiff's delay, because several of the leased premises, which plaintiff abandoned, have deteriorated and have fallen into disrepair. There are two (2) types of prejudice that will support a claim of laches: "(1) loss of evidence which would support defendant's position and (2) change of position in a way that would not have occurred but for the delay." Rich v. Class, 643 S.W.2d 872, 877 (Mo.Ct.App.1982). See also Goodman v. McDonnell Douglas Corporation, 606 F.2d 800, 808 (8th Cir.1979), cert. denied, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980). Defendants herein obviously rely on the second type of prejudice.
In the opinion of this Court, however, the prejudice asserted by defendants is not, as a matter of law, the type of change in position that will support a claim of laches. In Goodman, the Court rejected "the contention that the cost of litigation or the payment of lost wages by itself could constitute prejudice within the contemplation of laches defense", but accepted the contention that reliance on a later repudiated government agency interpretation could constitute such prejudice. Id. at 808-09. Here, defendants' claimed prejudice is more analogous to the cost of litigation and payment of lost wages in Goodman. The "but for" causal nexus between plaintiff's delay and the alleged deterioration in the stations is very weak because defendants were aware, as early as November 17, 1981, that Midwest was taking the position that the leases in question were terminated. Moreover, defendants could have prevented the alleged prejudice by doing the required maintenance on the stations under a reservation of rights and then seeking reimbursement from Midwest on the subleases. Finally, any prejudice that defendants suffered can be remedied by an award of damages if it is determined that the sub-leases in question were not terminated and, in fact, APMI has asserted a counterclaim *1114 for such relief. Accordingly, defendants' laches defense is rejected.

6. Waiver and Estoppel
Defendants next assert that plaintiff's claim is barred by the doctrines of waiver and estoppel. Defendants argue that Midwest's activities subsequent to termination of the JSC both estop it from asserting violations of the PMPA and constitute a waiver of said claims.
Waiver and estoppel are two separate doctrines. Waiver is the intentional relinquishment of a known right. Grebing v. First Nat'l Bank of Cape Girardeau, 613 S.W.2d 872, 876 (Mo.App. 1981). Absent the requisite intent there can be no waiver. Intent can be implied from conduct, but in order to do so "there must be a clear, unequivocal and decisive act implying the intent and the implication must be so consistent with an intention to waive that no other reasonable explanation is possible." Id. See also United Missouri Bank South v. Cole, 597 S.W.2d 209, 211 (Mo.App.1980); Kroh Brothers Development Co. v. State Line Eighty-Nine, Inc., 506 S.W.2d 4, 12 (Mo.App.1974) (and cases cited therein); Berger v. McBride & Son Builders, Inc., 447 S.W.2d 18, 20 (Mo.App. 1969). Moreover, the Kroh case, supra, makes it clear that "[f]orebearance is not a waiver." 506 S.W.2d at 12. See also Cole, supra, 597 S.W.2d at 212.
In order to establish estoppel, a court must find that certain essential elements exist with respect to both the person sought to be estopped and the person asserting estoppel. With respect to the party to be estopped, the following elements must exist: "(1) conduct which amounts to a false representation or concealment of material facts ...; (2) the intention ... that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts." 28 Am.Jur.2d, Estoppel and Waiver, § 35 at 640. With respect to the party claiming estoppel, the following elements must exist: "(1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice." Id. See generally Owens v. Estate of Saville, 409 S.W.2d 660, 664 (Mo.1966); Commerce Trust Co. v. Weed, 318 S.W.2d 289, 303 (Mo.1958); Kind v. Staton, 409 S.W.2d 253, 257-58 (Mo.App.1966); John Hancock Mutual Life Insurance Co. v. Dawson, 278 S.W.2d 57, 60-61 (Mo.App.1955). In addition, Missouri courts follow the following rules in assessing a claim of estoppel:
... [E]stoppels are not favorites of the law and will not be lightly invoked.... One who asserts an estoppel has the burden of establishing the facts on which it rests.... Every fact essential to create it must be established by clear and satisfactory evidence.... The conduct or writing on which reliance is placed must be absolute and unequivocal, and must be certain to every extent, for mere argument, inference, or intendment cannot support an estoppel....
John Hancock, supra, 278 S.W.2d at 60-61 (citations omitted).
In the case at bar, the conduct of Midwest that allegedly supports a claim of waiver and estoppel is the following: 1) from and after January 14, 1982, Midwest continued to pay rent for the Lindbergh, South Florissant and Fenton stations, even though Midwest claims that all leases and sub-leases were terminated concurrently with termination of the JSC; 2) Midwest paid rent on the Airport station through March 31, 1982, and on the Mount Vernon station through June 23, 1983; 3) Midwest continued to operate, collect rent from dealers at, pay property taxes on, and insure the Lindbergh, South Florissant and Fenton stations; 4) Midwest insured the Gravois, Halls Ferry, Lemay and Woodson stations; and 5) in October and November, 1982, and January, 1983, Midwest cashed rent checks from a dealer for the Woodson station.
*1115 With respect to estoppel first, it is the opinion of this Court that plaintiff is entitled to summary judgment on this defense. If defendants, in fact, relied on the above conduct of plaintiff, said reliance was hardly in good faith. Defendants knew in November, 1981, what plaintiff's position was and defendants knew that plaintiff abandoned and ceased to pay rent on the Fischer Fleet stations. In addition, defendants did not lack knowledge of the truth of the facts in question. In these circumstances, the defense of estoppel does not lie.
The waiver defense, however, requires a different result. Plaintiff fails to convince this Court that there is no genuine issue of material fact with respect to said defense or that plaintiff is entitled to a rejection of said defense as a matter of law. Plaintiff took the position in November, 1981, and continues to take the position before this Court, that the termination of the JSC effectively terminated all of plaintiff's obligations under all of the leases and sub-leases. Defendants took and continue to take the position that the leases and sub-leases were not so terminated and remain in effect. There is a valid waiver issue because plaintiff's subsequent conduct could be construed as intentionally relinquishing its right to assert that the leases and sub-leases were terminated. Plaintiff fails to adequately explain how the acts of retaining possession of three (3) stations, actively operating those three (3) stations, and cashing rent checks from the Woodson station tenant are consistent with plaintiff's allegation herein that all of the leases and sub-leases were terminated. Compare the facts of this case with those in Roberts v. Amoco Oil Company, 740 F.2d 602 (8th Cir.1984), where a service station lessee vacated the station premises and subsequently charged the lessor oil company with failing to make a "bona fide offer" to sell in violation of the PMPA.
Plaintiff's reliance on Brach v. Amoco Oil Co., 570 F.Supp. 1437 (N.D.Ill.1983), is misplaced, because the issue of waiver was not addressed therein and the positions of the parties were the reverse of the parties' positions herein. In Brach, the plaintiff's retention of possession of the station was not inconsistent with said plaintiff's claim that nonrenewal of the lease was illegal under the PMPA and that the lease was still in effect. In Brach, the defendant oil company argued that the leases had been terminated in accordance with the PMPA. Here, on the other hand, plaintiff does not contest the legality of defendants' termination of the JSC, but argues that, as a consequence of said termination, the leases and sub-leases were terminated. Defendants argue that the leases and sub-leases were not terminated as a result of their termination of the JSC and that Midwest is fully liable on said leases and sub-leases.
Moreover, the inference of waiver is even stronger when plaintiff's complaint and prayer for relief are examined. Plaintiff seeks damages for defendants' alleged violation of the PMPA in not offering the prime leases to plaintiff. However, plaintiff's complaint does not include a prayer for injunctive relief against APMI to force it to offer the prime leases on the three (3) occupied stations to Midwest. Such a prayer would at least be superficially consistent with Midwest's retention of those three (3) stations. Plaintiff's complaint also does not contain an offer to surrender said occupied leases. In addition, there is no allegation in plaintiff's complaint that termination of the JSC terminated only the Fischer Fleet sub-leases, as opposed to all of the leases and subleases. Clearly, plaintiff's theory is that all of the leases and subleases were terminated along with the JSC. In this light, plaintiff's litigation posture is difficult to reconcile with its conduct and, therefore, there is a genuine issue of fact with respect to the defense of waiver.

7. Release
Defendants' final affirmative defense is that plaintiff's claims are barred by the release that it executed in connection with the Consent Order. Plaintiff is entitled to summary judgment on this defense because the release, by its terms, *1116 was limited to conduct or actions that occurred prior to May 28, 1982, with respect to the Economic Stabilization Act or the federal petroleum price and allocation regulations. The release did not speak to PMPA claims nor did it operate to release defendants from claims arising out of their alleged failure to pay the amount offered in the "Notice of Offer of Payment Pursuant to DOE Consent Order."

B. MERITS OF MIDWEST'S COMPLAINT
Although Midwest's complaint consists of only one (1) count, plaintiff actually asserts two bases for relief. The first is that APMI violated the PMPA by not offering the prime leases to Midwest. The second is that the manner and amount of the payments under the Consent Order was a violation of both the Consent Order and the contract formed by Midwest's acceptance of the offer of payment. To further narrow and simplify the issues in this case, this Court will first address the latter basis for relief.

1. DOE Consent Order
Midwest's claim with respect to the Consent Order has two (2) components. First, Midwest argues that the terms of the Consent Order did not permit any entity other than API to make the payments thereunder. Second, Midwest argues that, regardless of which entity could make the payment, the Consent Order did not authorize the deduction of any existing debit balance in an account with that entity. Both arguments must be rejected.
The first argument must be rejected because API's subsidiaries were parties to both the Consent Order and the contract. The Consent Order referred to the party consenting as "Fina" and expressly defined "Fina", as follows:
References in this Consent Order to Fina include (without limitation) its subsidiaries, affiliates, and successors in interest, and its petroleum related activities as refiner, producer, operator, working or royalty interest owner, reseller, natural gas processor, or otherwise, and, except for Paragraphs 401 through 404, also include the officers, directors and employees of Fina.
¶ 301. In the opinion of this Court, ¶ 301 made all Fina-related entities parties to the Consent Order. In addition, because the offer also used the term "Fina", all Fina-related entities were parties to the contract.
The second argument must be rejected, because the terms of ¶ 402(g) of the Consent Order permitted Fina to credit the amounts due thereunder against any debit balance which the recipient had with Fina. Paragraph 402(g) provided, in pertinent part, as follows:
... Fina shall pay, by check or credit memorandum, to each Eligible Qualifying Jobber its share of the $14,000,000. ...
By use of the term "credit memorandum", the Consent Order authorized the method of payment used by APMI. In addition, nothing in the contract formed pursuant to the Consent Order altered the availability of payment by credit memorandum.
It does not follow, however, that Midwest is not entitled to the amounts withheld by APMI from the three (3) Consent Order payments. Almost all of the debit balance in Midwest's APMI account represented rent allegedly due under the Fischer Fleet stations sub-leases. Thus, the primary issue with respect to the Consent Order payments is not whether the payor or the manner of calculating said payments violated the Consent Order or the contract, but whether Midwest in fact owed APMI the amounts represented by the debit balances in its account. The latter issue is the only material issue raised by plaintiff's complaint and said issue turns on the application of the PMPA to the facts of this case.

2. PMPA
To obtain partial summary judgment on the issue of APMI's liability under the PMPA, plaintiff must establish that there is no genuine issue of material fact and *1117 that each of the following must, as a matter of law, be answered in the affirmative:
1) Was the PMPA applicable to the relationship between Midwest and APMI?;
2) Were the leases and sub-leases terminated when the JSC was terminated?; and
3) Did APMI violate the PMPA by not offering the prime leases to Midwest?

a. Applicability of PMPA
The PMPA was enacted by Congress in 1978 to alleviate several evils which Congress perceived to exist in the petroleum marketing industry. See Brach v. Amoco Oil Co., 677 F.2d 1213, 1216 (7th Cir.1982). The Court of Appeals for the Eighth Circuit recently surveyed the background and the provisions of the PMPA, as follows:
Congress enacted the PMPA after investigating and considering numerous allegations that petroleum franchisors used threats of termination or non-renewal of the franchise to compel franchisees to comply with their marketing policies. There were also numerous complaints before Congress of unfair terminations and non-renewals for arbitrary and discriminatory reasons. These practices thus posed a threat to the independence of the franchisee as a competitive influence in the marketplace. Congress intended the PMPA to address this disparity in bargaining power. S.Rep. No. 95-731, 95th Cong., 2d Sess. 17-19, reprinted in 1978 U.S.Code Cong. & Ad. News 873, 875-877.
The statute seeks to protect and to effectuate the franchisee's reasonable expectations that the franchise relationship will be a continuing one. Id. at 18, 1978 U.S.Code Cong. & Ad.News at 876. It regulates the conditions and grounds for which a franchisor may terminate or not renew a franchise. See 15 U.S.C. § 2802. It requires that franchisors provide advance notice of termination and non-renewal before taking action. Id. The PMPA further provides franchisees with a cause of action against franchisors for violation of these provisions. Id. at § 2805. Relief includes a preliminary injunction and other equitable relief, as well as actual and exemplary damages and attorney and expert witness fees. Id.

Roberts v. Amoco Oil Co., 740 F.2d 602, 605 (8th Cir.1984).
Section 2802 contains the primary substantive provisions of the PMPA. Subsection (a) generally prohibits a franchisor engaged in the sale of motor fuel in commerce from terminating any "franchise" or failing to renew any "franchise relationship". 15 U.S.C. § 2802(a). Sub-section (b)(1) then provides an exception to the prohibition contained in sub-section (a), which exception applies when the following two requirements are satisfied: (A) The franchisor complies with the notification requirements of § 2804 of the PMPA; and (B) The termination or non-renewal is based upon a ground described in paragraph (2) or paragraphs (2) or (3) of sub-section (b), respectively. 15 U.S.C. § 2802(b)(1). In the case at bar, the threshold dispute is not whether APMI's non-renewal of the JSC complied with the exception contained in § 2802(b)(1), but whether the PMPA was even applicable to the JSC. Resolution of this dispute, requires an application of the definitional provisions of § 2801 of the PMPA to the relationship between the parties in this case.
The key term in the statute is "franchise" and this term is defined by the PMPA, as follows:
Any contract
(i) between a refiner and a distributor,
(ii) between a refiner and a retailer,
(iii) between a distributor and another distributor, or
(iv) between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.
*1118 15 U.S.C. § 2801(1)(A). Paragraph (B) of § 2801(1) expands on the definition of "franchise" by providing illustrations of what constitutes a "franchise". Two of these illustrations include a service station lease which authorizes a retailer or distributor to use a trademark owned or controlled by a refiner in connection with the sale of motor fuel, and a motor fuel supply contract which authorizes the sale or distribution of said motor fuel under a trademark owned or controlled by a refiner. 15 U.S.C. § 2801(1)(B). Section 2801 also defines the terms "franchisor", "franchisee", "refiner", "distributor", and "trademark". A "franchisor" is:
A refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.
15 U.S.C. § 2801(3). A "franchisee" is:
A retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.
15 U.S.C. § 2801(4). A "refiner" is:
Any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.
15 U.S.C. § 2801(5). A "distributor" is defined, in pertinent part, as follows:
Any person, including any affiliate of such person, who ...
(A) purchases motor fuel for sale, consignment, or distribution to another....
15 U.S.C. § 2801(6). Finally, a "trademark" is defined, as follows:
Any trademark, trade name, service mark, or other identifying symbol or name.
15 U.S.C. § 2801(11).
APMI argues that this Court cannot enter summary judgment on the issue of whether the PMPA is applicable to the JSC, because several questions of fact exist with respect to the definitional provisions referred to above. Specifically, APMI contends that plaintiff has not proven that it is either a refiner or a distributor within the meaning of the PMPA or that APMI owns or controls a trademark. Although APMI's arguments are again based on the erroneous assumption that it may rest on its pleadings in the face of a motion for summary judgment, it is the opinion of this Court that Midwest has carried its burden of demonstrating that there are no genuine issues of material fact with respect to the applicability of the PMPA. Moreover, this Court is convinced that the PMPA is applicable to the JSC, as a matter of law.
In the opinion of this Court, APM constitutes a "refiner" within the meaning of the PMPA. It is undisputed in this case that APCOT is engaged in refining crude oil to produce motor fuel. It is also undisputed that APCOT is a wholly-owned subsidiary of API and that APCOT owns 60% of the stock of APMI. Under these facts, APMI is an "affiliate" of APCOT. The PMPA defines "affiliate", as follows:
Any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.
15 U.S.C. § 2801(15). Because APMI is an affiliate of APCOT and APCOT is a refiner, APMI is a refiner within the meaning of the PMPA. It is also undisputed that Midwest is a distributor within the meaning of the PMPA and that the JSC was a contract between APMI, a refiner, and Midwest. Thus, the only obstacle to a finding that the JSC was a "franchise" within the meaning of the PMPA, and thus subject to the strictures of the PMPA, is whether the JSC authorized Midwest, a distributor, to use, in connection with the sale of motor fuel, a trademark owned or controlled by APMI, a refiner.
APMI argues that there can be no finding of a franchise in the case at bar because Midwest failed to prove that the JSC was entered into by a refiner that owns or controls a trademark. In the opinion of this Court, the JSC estops APMI from denying that it owns or controls the trademark "Fina". Under the JSC, APCOT expressly *1119 granted Midwest a license to sell, distribute, and job petroleum products under the brand name "Fina". In addition, the JSC required Midwest to sell products purchased under the JSC only under the "Fina" name. The JSC was later assigned to APMI and, therefore, APMI is bound thereby. The terms of the JSC are sufficient evidence for this Court to conclude that APMI in fact owns or controls the brand name "Fina". Because APMI has not suggested that there is any evidence to the contrary, there is no genuine issue of fact with respect to whether APMI owned or controlled the brand name "Fina". Moreover, the brand name "Fina" constitutes a "trademark" within the meaning of the PMPA as a matter of law, because, at the very least, "Fina" is an identifying symbol or name. Accordingly, the JSC was a contract between a refiner and a distributor under which said refiner authorized said distributor to use, in connection with the sale of motor fuel, a trademark owned or controlled by said refiner and the PMPA applies to the JSC. The correctness of this holding is further supported by the fact that the JSC, a supply contract which authorized the sale of motor fuel under a trademark owned or controlled by a refiner, fits within the illustration of a "franchise" found in § 2801(1)(B)(ii). 15 U.S.C. § 2801(1)(B)(ii).

b. Effect of Non-Renewal of the JSC Upon the Leases and Sub-Leases
The central issue in this case is whether APMI's non-renewal of the JSC had the effect, under the PMPA, of terminating the leases and sub-leases. Midwest offers two rationales for its position that the leases and sub-leases were terminated when the JSC was not renewed: first, the JSC together with the leases and sub-leases constituted a "franchise relationship" within the meaning of the PMPA and non-renewal of the JSC terminated the leases and sub-leases because said non-renewal made the trademark licenses in the leases and sub-leases valueless; second, APMI, in terminating the JSC, relied on the ground that the JSC was "uneconomical" and APMI could only rely upon this ground if the leases and sub-leases were terminated along with non-renewal of the JSC. APMI's response to the first rationale is that the facts in this case support a finding that the JSC and the leases and sub-leases were entirely separate and independent documents and, thus, should not be considered together as a "franchise relationship". APMI argues that an issue of fact exists and that a more complete factual record is required on this issue. With respect to the second rationale, APMI responds that its use of the term "uneconomical" in the termination letter does not prevent it from relying on other permitted grounds for termination and that it was permissible to rely upon the "uneconomical" ground with respect to termination of the JSC alone.
APMI points to the following facts to support its argument that there is an issue with respect to the factual separateness of the JSC and the leases and sub-leases: 1) the JSC was entered into several years prior to the leases and sub-leases; 2) the JSC had annual terms whereas the leases and sub-leases had five (5) to fifteen (15) year terms; and 3) the various agreements did not reference each other. While this evidence does support a finding that the agreements were factually separate, in the opinion of this Court, the issue of factual separateness is not legally relevant under the PMPA. Therefore, a more complete factual record is not required and summary judgment is appropriate herein.
In addition, this Court does not deem the term "franchise relationship" applicable in the present case. The PMPA defines the term "franchise relationship", as follows:
[T]he respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.
15 U.S.C. § 2801(2). Much of the parties' discussion in this case concerns the proper interpretation of the term "franchise relationship" and its applicability in this case. This Court agrees with APMI that the legislative *1120 history of the PMPA makes it clear that the term "franchise relationship" is not applicable to the facts of this case. The following passage from Senate Report No. 95-731 indicates that Congress utilized the term "franchise relationship" to cover two situations:
The term is defined to cover the broad relationship which exists between a franchisor and a franchisee by reason of the franchise agreement. The term is utilized for two reasons. First, in the renewal context, the contract which constitutes the franchise may no longer exist and the term "franchise relationship" is utilized to avoid any contention that because the "franchise" does not exist there is nothing to renew. The renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement. Second, because the title contemplates changes in the specific provisions of the franchise agreement at the time of renewal the title requires renewal of the relationship between the parties as distinguished from a continuation or extension of the specific provisions of the franchise agreement. Use of the narrower term "franchise" in this context could raise unintended questions regarding the ability of the franchisor to comply with the renewal obligations of the title by offering a franchise agreement which differs in any particular from the expiring franchise.
S.Rep. No. 731, 95th Cong., 30 reprinted in 1978 U.S.Code Cong. & Ad.News 873, 888. Neither of these two (2) purposes is implicated in the case at bar. First, there is no contention here that because the franchise does not exist, there is nothing to renew. The contention here is that APMI could not terminate the JSC without also effectively terminating the leases and subleases. Second, the present situation does not involve a change in specific provisions of the franchise agreement and a subsequent continuation thereof. Accordingly, the PMPA's use of the term "franchise relationship" has no effect on the outcome of this case.
The term "franchise", however, does affect the outcome of this case and warrants a holding that non-renewal of the JSC resulted in termination of the leases and sub-leases. In the case at bar, the leases and sub-leases, like the JSC, also constituted "franchise[s]" within the meaning of the PMPA. For the same reasons that the JSC was a contract between a "refiner" and a "distributor", the leases and sub-leases were such. More importantly, the leases and sub-leases contained the following grant of a trademark license:
Lessor hereby licenses Lessee to use the advertising, color combinations, slogans, trademarks and trade names of Lessor solely on the Leased Premises and on and in connection with petroleum products purchased from Lessor, to be used only during such time as this Lease shall be in effect.... Lessee is licensed to use such trademarks, trade names, advertising signs and devices upon the conditions that they will not be used in the advertising or identification of any petroleum products except those of lessor;
....
¶ 13 of Sub-leases; ¶ 9 of Leases. As discussed, supra, APMI is estopped to deny that it owned or controlled the trademark that it licensed to Midwest in the leases and sub-leases. Moreover, this type of service station lease is one of the illustrations of a "franchise" found in the PMPA. 15 U.S.C. § 2801(1)(B)(i). Thus, the leases and sub-leases were "franchise[s]" and their status as such is the key to this Court's conclusion that they were terminated by termination of the JSC.
The legislative history of the PMPA is very helpful in determining what Congress intended by using the term "franchise":
The term "franchise" is defined in terms of a motor fuel trademark license. It should be noted that the term is applicable only to the use of a trademark which is owned or controlled by a refiner. Secondary arrangements, such as leases of real property or motor fuel agreements, *1121 are incorporated in the definition of a franchise. Therefore the substantive provisions of the title, relating to the termination of a franchise or non-renewal of the franchise relationship, may not be circumvented by a termination or non-renewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless. The broader definition, however, is not intended to encompass other contractual arrangements which may exist between a franchisor and a franchisee, e.g., credit card arrangements, contracts relating to financing of equipment, or contracts for purchase and sale of tires, batteries, or automotive accessories.
S.Rep. No. 731, 95th Cong., 30 reprinted in 1978 U.S.Code Cong. & Ad.News 873, 888. Obviously, the trademark license is the crucial characteristic of a "franchise" for purposes of the PMPA and it is the focal point of the scheme adopted by Congress. In the case at bar, there is little question that termination of the JSC rendered the trademark licenses in the leases and sub-leases valueless. This is because Midwest could use the "Fina" brand at the leased and sub-leased premises only in connection with motor fuel purchased from APMI and the JSC was the only means by which Midwest could obtain motor fuel from APMI. Non-renewal of the JSC effectively terminated the leases and sub-leases simply because the trademark licenses in the latter agreements were rendered valueless thereby. For the leases and sub-leases, the JSC was one of the "[s]econdary arrangements ... incorporated in the definition of a franchise." Id. To allow APMI to terminate the JSC, but simultaneously enforce the leases and sub-leases, would allow APMI to "circumvent" the "substantive provisions of the [PMPA]", id., in contravention of Congress' intent. See Prestin v. Mobil Oil Corporation, 741 F.2d 268, 272 (9th Cir.1984) ("the term `franchise' combines both the lease of real property and the motor fuel supply agreement.").
In its defense, APMI makes much of the fact that the leases and sub-leases are valuable to Midwest without the JSC, because Midwest is free to sell motor fuel, regardless of its source, under any brand other than "Fina". In fact, Midwest is currently selling gas at the Lindbergh, South Florissant, and Fenton stations under the "Sunoco" brand. As authority for its position, APMI relies on Smith v. Atlantic Richfield Co., 533 F.Supp. 264 (E.D.Pa.1982). In Smith, the plaintiff entered into a service station lease agreement with the defendant oil company, which agreement allowed the plaintiff to market gas under the "ARCO" brand name. However, the plaintiff also entered into a "Convenience Store Agreement" which made the plaintiff a franchisee under the defendant oil company's "am/pm" trademark and convenience store marketing scheme. Following a dispute concerning the presence of video games in the plaintiff's "am/pm" store, the defendant oil company terminated the "Convenience Store Agreement" and then the plaintiff sued alleging that the termination was subject to the PMPA. The plaintiff argued that the "Convenience Store Agreement" was a "secondary arrangement" and that the termination resulted in termination of the motor fuel franchise. The Smith Court rejected the plaintiff's argument for the reason that the "Convenience Store Agreement" was "not essential to the operation of the motor fuel franchise" and, therefore, dismissed the plaintiff's complaint for lack of jurisdiction. Id. at 268.
APMI argues that the fact that the leases and sub-leases herein are valuable without the JSC proves that the JSC was not "essential", as that test was applied in Smith, to the leases and sub-leases. APMI's argument must be rejected for two (2) reasons. First, it overlooks the fact that the primary focus of the PMPA is on the value of the trademark license in the relevant agreement, not the value of the realty lease or the supply agreement. Second, while this Court agrees that Smith was correct in its statement and application of the law, and apparently Smith is the only case that comes close to dealing with *1122 the issues in this case, the facts in the case at bar are significantly distinguishable. In Smith, the "am/pm" franchise had no connection to the motor fuel franchise, other than the fact that both franchises occupied the same premises. Termination of the "am/pm" franchise had no effect on the value of the plaintiff's license to use the "ARCO" brand. Thus, the "am/pm" franchise was not the type of "secondary arrangement" that Congress intended to be covered by the PMPA. Here, on the other hand, Midwest's license in the leases and sub-leases to use the "Fina" brand was rendered valueless by non-renewal of the JSC.
Accordingly, this Court holds that termination of the JSC resulted in termination of the leases and sub-leases. This Court declines to pass on the merits of Midwest's second rationale for its termination argument.

c. Violation of the PMPA
Having determined that the PMPA is applicable and that termination of the JSC resulted in termination of the leases and sub-leases, the only remaining issue is whether APMI violated the PMPA by failing to offer the prime leases to Midwest. The parties agree that the source of APMI's obligation, if any, to offer Midwest the prime leases is found in § 2802(b)(3)(D)(i)(IV) and (iii). Section 2802(b)(3)(D) contains one of a number of permissible grounds for non-renewal of a franchise relationship and provides, in pertinent part, as follows:
In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is three years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was three years or longer, or with respect to which the franchisee was offered a term of three years or longer), a determination made by the franchisor in good faith and in the normal course of business, if ... such determination is ... that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; ... and ... in the case of leased marketing premises such franchisor, during the ninety-day period after notification was given pursuant to § 2804 of this title, either ... made a bonafide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises. ...
15 U.S.C. § 2802(b)(3)(D)(i)(IV) and (iii). It is undisputed that APMI never offered to convey its interest in any of the leased and sub-leased sites to Midwest, either within the prescribed ninety (90) day period or otherwise.
APMI argues that it did not have an obligation to offer the prime leases to Midwest because it did not rely on the "uneconomical" ground with respect to termination of the JSC and did not rely on any ground with respect to termination of the leases and sub-leases. Although APMI used the term "uneconomical" in its notification letter of August 21, 1981, APMI contends that it was not thereby electing to proceed under the ground listed in § 2802(b)(3)(D)(i)(IV) in terminating the JSC. APMI asserts that it can rely on other permissible grounds under the PMPA if it can be shown that Midwest had knowledge of those grounds and, therefore, Midwest's knowledge is a material issue of fact precluding the entry of summary judgment in plaintiff's favor.
As authority for its position, APMI relies on several decisions which support the proposition that under the PMPA there is no requirement that a franchisor "parrot" the statutory language in giving a notice of termination or non-renewal and that the PMPA merely requires that the basis or reasons for the franchisor's decision be stated in the notice. See, e.g., Perk v. Standard Oil Company, Inc., 725 F.2d 676, slip op. at 10 (4th Cir.1984); Brach v. Amoco Oil Co., 677 F.2d 1213, 1226 (7th Cir.1982); Loomis v. Gulf Oil Corp., 567 F.Supp. 591 (M.D.Fla.1983); Orr v. Texaco, *1123 Inc., 1980-81 Trade Cas. (C.C.H.) ¶ 63,672 (N.D.Ga.1980). See also Hanes v. Mid-American Petroleum, Inc., 577 F.Supp. 637 (W.D.Mo.1983); Clark v. Mobil Oil Corp., 496 F.Supp. 132 (E.D.Mo.) aff'd. 652 F.2d 2 (8th Cir.1980). None of these decisions, however, speaks directly to the issue at hand, namely, the relationship between the language used by a franchisor in its notice of termination or non-renewal and the grounds upon which it may rely for said termination or non-renewal.
APMI cites the unpublished decision in Hooper Oil Company, Inc. v. American Petrofina Marketing, Inc., 720 F.2d 1289 (5th Cir.1983), as authority for its position that use of the term "uneconomical" in a notice of termination letter does not limit the franchisor to the ground stated in § 2802(b)(3)(D)(i)(IV) of the PMPA. In Hooper, prior to termination the franchisee had failed to pay the franchisor for products that it had purchased from the franchisor and the franchisor had, in fact, reduced its claim to a judgment. The Court held that the franchisor's use of the term "uneconomical" in its termination notice did not limit it to the ground in § 2802(b)(3)(D)(i)(IV) of the PMPA, because the franchisor had proven that the franchisee actually knew that "uneconomical" meant "`because you are delinquent in the extreme and haven't paid us the quite substantial sums you owe us which we were required to reduce to judgment.'" Hooper, slip op. at 5. Thus, the franchisor had a proper ground for termination other than that stated in § 2802(b)(3)(D)(i)(IV), namely, noncompliance with a material term of the contract. Id. See 15 U.S.C. § 2802(b)(2)(A). The Court explained its conclusion, as follows:
We decline to impose hyper-technical requirements on the notices of termination or non-renewal under the PMPA. Hyper-technical requirements are especially inappropriate in cases such as this one in which the franchisee had actual knowledge that ample grounds existed for the franchisor to terminate the franchise, and knew exactly what those grounds were. In determining the sufficiency of notice, a court should consider not only the reason stated in the formal notice, but all the facts about non-renewal or termination known to the franchisee. ... "The PMPA requires only that the franchisor articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act." ... As long as the franchisor meets this requirement, he need not quote the language of the PMPA specifically or fear that his notice may be construed as an election of grounds for termination or non-renewal that excludes all others.
Hooper, slip op. at 5-6 (citations omitted).
Aside from the fact that Hooper's precedental value is questionable, see 5th Cir.R. 47.5.3, it is the opinion of this Court that it was wrongly decided. The purpose of the PMPA notification requirement is to allow the franchisee to determine his rights under the Act. This Court agrees that a notice is not insufficient if it fails to mimic the language of § 2802(b). However, where a notice of termination does use language found in § 2802(b), a franchisor should not thereafter be allowed to argue that by using said language it really meant something else.[10] The franchisee's rights vary under the PMPA in relation to the ground relied on by the franchisor. A franchisee is in a difficult position, with respect to determining its PMPA rights, if it has to guess which ground the franchisor will rely on. In enacting the PMPA, Congress intended to correct what it perceived as a "disparity of bargaining power" between the franchisor and franchisee in the petroleum marketing industry. S.Rep. No. 731, 95th Cong., 17 reprinted in 1978 U.S.Code Cong. & Ad. *1124 News 873,876. It is entirely consistent with this remedial purpose to limit a franchisor to a particular ground if said franchisor actually uses the language of the PMPA, rather than require a franchisee to speculate as to which ground said franchisor actually intends to rely on.
Alternatively, assuming that Hooper was correctly decided and that a franchisor may rely on a ground other than that stated in the notice of termination if the franchisee actually knew that said franchisor actually meant another ground, Midwest is still entitled to summary judgment on the issue of whether APMI violated the PMPA. Again, APMI incorrectly assumes that it need not do anything in opposition to a motion for summary judgment. APMI has not convinced this Court that there is evidence which creates an issue of fact concerning Midwest's knowledge or the availability of other PMPA grounds. The following statement from APMI's Memorandum is the length and breadth of APMI's showing that an issue of fact exists:
Whether other permissible grounds were available to APMI under the PMPA, such as those set forth in Section 102(b)(2)(A) (failure to comply with any provision of the franchise) or Section 102(b)(2)(B) (failure to exercise good faith efforts to carry out the provisions of the franchise), constitutes a material issue of act precluding the entry of summary judgment in plaintiff's favor.
Memorandum In Opposition to Motion of Midwest Petroleum Company For Partial Summary Judgment at 44-45. APMI has failed to present facts from which this Court could infer that APMI intended to rely on other grounds when it used the language contained in its notice of termination or that Midwest had actual knowledge of what APMI really intended. APMI does not even state that it will, at a later date, present evidence which supports such inferences. Thus, even if APMI's legal arguments are correct, the only ground that APMI can rely on is the "uneconomical" ground of § 2802(b)(3)(D)(i)(IV).
APMI's other argument, that it did not rely on any ground with respect to termination of the leases and sub-leases, must also be rejected. Because termination of the JSC resulted in termination of the leases and sub-leases, the ground stated for termination of the JSC must also be APMI's ground for termination of the leases and sub-leases. Further, because APMI relied on § 2802(b)(3)(D)(i)(IV) and did not offer Midwest the prime leases as required by § 2802(b)(3)(D)(iii), APMI violated the PMPA.

CONCLUSION
This Court holds that Midwest is entitled to partial summary judgment with respect to several issues in this case. First, Midwest is granted summary judgment on defendants' following affirmative defenses: 1) failure to comply with the PMPA; 2) lack of actual damages[11]; 3) statute of limitations; 4) laches; and 5) release. Second, this Court holds that the PMPA was applicable to the JSC and the leases and sub-leases, that termination of the JSC resulted in termination of the leases and subleases, and that APMI violated the PMPA by not offering Midwest the prime leases as required by § 2802(b)(3)(D)(iii). On the other hand, this Court holds that it does not have personal jurisdiction over API and that API is dismissed from this case. In addition, Midwest is not entitled to summary judgment on APMI's affirmative defense of waiver and a genuine issue of fact, requiring a trial, exists with respect to said defense. Further, this Court holds that APMI did not per se violate either the DOE Consent Order or the contract created pursuant thereto by the fact that API was not the payor of the Consent Order payments *1125 or that rent allegedly due was deducted from the amount of said payments. Midwest is not entitled to partial summary judgment on APMI's counterclaims or Midwest's right to a refund of the amounts withheld from its DOE Consent Order payments, because the merits of those issues turn on whether Midwest waived its right to assert that the leases and sub-leases were terminated.
Accordingly, a trial will be ordered herein. The only issues to be tried are APMI's affirmative defense of waiver, Midwest's right to monetary damages, and APMI's counterclaims. After conferring with the parties, this Court will determine the advisability of trying the issue of waiver separately from the issues of damages or APMI's counterclaims, because the outcome of the former issue may moot one of the latter issues.

ORDER
Pursuant to the Memorandum filed herein this day,
IT IS HEREBY ORDERED that plaintiff's motion for partial summary judgment be and is granted in part and denied in part.
First, it is granted with respect to defendants' following affirmative defenses: 1) failure to comply with the PMPA; 2) lack of actual damages; 3) statute of limitations; 4) laches; and 5) release. Second, it is also granted with respect to the substantive merits of plaintiff's complaint and this Court holds that: 1) the PMPA was applicable to the JSC and the leases and sub-leases; 2) termination of the JSC resulted in termination of the leases and sub-leases; and 3) APMI violated the PMPA by not offering the prime leases to Midwest. It is denied with respect to API's affirmative defense of lack of personal jurisdiction and API is dismissed from this case. It is also denied with respect to APMI's affirmative defense of waiver. Further, this Court rejects Midwest's argument that APMI per se violated the DOE Consent Order and the contract created pursuant thereto by the facts that API was not the payor of the Consent Order payments and that rent allegedly due was deducted from the amount of said payments. Midwest is not entitled to partial summary judgment on APMI's counterclaims or Midwest's right to a refund of the amounts withheld from its DOE Consent Order payments, because the outcome of those issues turns on whether Midwest waived its right to assert that the leases and sub-leases were terminated.
NOTES
[1] Plaintiff also seeks relief under the Department of Energy Organization Act, Pub.L. No. 95-91, 91 Stat. 565 (1977); the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751-60; and the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. However, plaintiff's primary claim, and the primary focus of plaintiff's motion for partial summary judgment, rests on the PMPA.
[2] In the opinion of this Court, the matters of statute of limitations and personal jurisdiction should have been the subject of an earlier motion by defendants. The facts supporting these defenses are not in dispute and should not, therefore, be reserved for a trial on the merits. If, as is partially the case here, defendants' position on these matters were meritorious, a ruling thereon would dispose of the entire case or result in dismissal of one (1) defendant. If, as is also partially the case here, defendants' position on these matters were not meritorious, a ruling thereon would result in a reduction and simplification of the issues reserved for trial. Defendants have improperly ignored the interests of this Court by failing to make these matters the subject of an earlier appropriate motion.
[3] According to defendants, APCOT did not profit directly from these lease arrangements because said arrangements took the form of three-party "wash-out" leases. Typically, APCOT leased the service stations from the owners and then APCOT sub-leased the stations to Midwest for the same rent that APCOT was paying to the owner.
[4] By instruments dated May 22, 1980, APCOT assigned to APMI the leases for the Halls Ferry, Gravois, Lemay, Woodson, Page, Lindbergh, South Florissant, California, and Manchester stations. APCOT retained the lease for the Mount Vernon station.
[5] Typically, the lease and sub-leases provided, in pertinent part, as follows:

Lessor hereby licenses Lessee to use the advertising, color combinations, slogans, trademarks and trade names of Lessor solely on the Leased Premises and on and in connection with petroleum products purchased from Lessor, to be used only during such time as this Lease shall be in effect.
Sub-Lease ¶ 13.
[6] Apparently, Midwest's reduced purchases created two (2) problems for APMI. First, APMI was not meeting its obligations to its suppliers with respect to gasoline that it arranged for resale to Midwest. Second, APMI was incurring substantial costs in connection with its credit card program. For example, in 1980 Midwest had $9,753,620.00 in Fina credit sales and APMI incurred $395,021.00 in costs in providing credit card services to Midwest; and from January to August, 1981, Midwest had $4,783,343.00 in Fina credit sales and APMI incurred $203,769.00 in costs. Midwest was aware of the first problem.
[7] On August 20, 1981, the value of the Airport station had been appraised as being $115,000.00. On November 4, 1981, Midwest offered to buy the Airport station from APMI for $100,000.00 and delivered a check for $10,000.00 to APMI as earnest money. The check was returned to Midwest by APMI.
[8] At page 20 of defendants' Memorandum In Opposition, defendants state that the Page station was closed by Midwest as of November 1, 1976. However, there is no evidence that the sub-lease was ever cancelled or that Midwest stopped paying rent thereon before January, 1982. Accordingly, this Court must assume that the Page station sub-lease is as effective as the other Fischer Fleet station sub-leases.
[9] The record before this Court does not reflect the status of the California and Manchester stations. However, they are not relevant because plaintiff does not seek those stations and APMI does not seek rent for them.
[10] In the case at bar, APMI did more than merely use the term "uneconomical". The language that APMI used in its August 21, 1981, letter "parroted" nearly all of the pertinent provisions of § 2802(b)(3)(D)(i)(IV): "APMI, as Seller, acting in good faith and in the normal course of business, has made a determination that a renewal of the contractual relationship ... would be uneconomical...." (emphasis added).
[11] The effect of summary judgment with respect to this particular affirmative defense means only that lack of actual damages is not a complete defense to liability under the PMPA. It does not mean, assuming that Midwest prevails on the waiver issue, see infra, and this case proceeds to a trial on damages, that APMI may not assert a defense of lack of actual damages to Midwest's claim for damages.