635 F.Supp. 815 (1986)
MIDWEST PETROLEUM COMPANY, Plaintiff,
v.
AMERICAN PETROFINA MARKETING, INC., Defendant.
No. 83-93C(1).
United States District Court, E.D. Missouri, E.D.
June 2, 1986.
*816 James P. Tierney, Alfred R. Hupp, Jr., Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., Paul Brackman, Thomas G. Brackman, Brackman, Copeland, Oetting, Copeland, Walther & Schmidt, Clayton, Mo., for plaintiff.
Kenneth R. Heineman, Ellen E. Bonacorsi, Coburn, Croft & Putzell, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.

BACKGROUND
This cause of action arises out of the cancellation of a Jobber Sales Contract (JSC) to sell petroleum. Under the terms of the JSC, entered into in 1959, Midwest Petroleum Co. (Midwest) was to purchase petroleum products from American Petrofina Marketing, Inc. (APMI).[1] Included in the terms of the JSC was a license for Midwest to sell petroleum products under the brand name "Fina".
In a prior order, dated March 5, 1985, the Court granted partial summary judgment in this action in favor of Midwest. Midwest Petroleum Co. v. American Petrofina, Inc., 603 F.Supp. 1099 (E.D.Mo.1985). The Court found that the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq. (1982), was applicable to the JSC between Midwest and APMI and to the gas station leases and subleases between these two parties. Id. at 1117-1119. The Court further found that termination of the JSC resulted in termination of the leases and subleases and that APMI violated the PMPA by not offering the prime leases to Midwest. Id. at 1122-24.
*817 Having granted partial summary judgment, the only remaining issues are the permissibility of APMI's conduct in terminating the JSC, APMI's affirmative defense of waiver, Midwest's right to monetary damages and APMI's counterclaims. Id. at 1125. The parties agreed to bifurcate the trial to consider only the issues of permissibility of APMI's conduct in terminating the JSC and the issue of waiver. From November 12, 1985 through November 14, 1985, these issues were tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

FINDINGS OF FACT
1. Midwest is, and was on the date the complaint was filed herein, a corporation incorporated in the State of Missouri with its headquarters and principal place of business in St. Louis, Missouri. Midwest is known in the petroleum industry as a "jobber", which means that it purchases gasoline and other motor fuel products from various sources, then resells those products to local service station dealers or to the public.
2. APMI is, and was on the date the complaint was filed herein, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Dallas, Texas. APMI is qualified to do business and is doing business in the State of Missouri.
3. On or about January 7, 1959, Midwest and American Petrofina Co. of Texas (APCOT) entered into a JSC (also known as a Distributor Sales Contract). The JSC was amended by the parties several times throughout the duration of the contract.
4. After the expiration of the initial five year term of the JSC it was renewed annually through January 14, 1982, pursuant to an automatic renewal provision.
5. In an instrument dated December 20, 1979, APCOT assigned the JSC to APMI.
6. APMI operated a "branded program" under the name of Fina. As a branded independent, APMI offered its jobbers a source of product, financing, credit cards and brand recognition. As part of its program, APMI undertook various obligations for the benefit of its jobbers. Such obligations included advertising and sales promotion, training programs, credit card promotion and processing, lease/sublease arrangements and exchange agreements for distribution of gasoline by third parties. APMI would also paint the jobbers' service stations with Fina colors and erect a Fina sign.
7. Under the JSC, Midwest purchased gasoline from APMI for resale under the Fina name. Midwest was, at one time, one of APMI's largest jobbers. During the period 1981-1982, approximately 80 service stations were being operated under the "Fina" name either by Midwest through salary employees or by independent dealers of Midwest.
8. In order to supply the needs of Midwest and other jobbers in the St. Louis area, APMI provided for distribution of gasoline at three terminals: the Conoco terminal; a terminal operated by Williams Brothers; and a third terminal in the vicinity of Jefferson Barracks. When the agreement with the Jefferson Barracks terminal expired, APMI, at Midwest's suggestion, entered into a "loan or exchange" agreement with Gulf Oil Corporation. The agreement, entered into in 1979, allowed APMI jobbers to draw approximately a million and a half gallons per month from the Gulf terminal.[2]
*818 9. Pursuant to APMI's branded independent program, APMI would assist a distributor or jobber, such as Midwest, in obtaining stations from which to sell its product. The case at bar involves some 13 stations located in St. Louis and the surrounding area. With respect to 11 of the stations, APMI leased the property from a third party and then subleased the property to Midwest on a washout basis, i.e., Midwest would pay the same rent APMI paid.[3] These "three-party deals" were for the benefit of both parties. Some lessors preferred to have the credit and reputation of a large company, such as APMI, on the lease. As a result, Midwest was able to obtain additional service stations from parties who would not rent directly to Midwest. APMI was benefited by the fact that additional service stations resulted in additional sales of gasoline. In two cases, APMI owned the stations. Midwest leased these two stations directly from APMI.[4]
10. It has been stipulated that Midwest purchased the following amounts of gasoline pursuant to the JSC for the years listed:

Year Gallons
1974 50,300,812
1975 58,063,123
1976 54,630,319
1977 43,564,703
1978 38,902,026
1979 30,093,532
1980 28,414,719
1981[*] 8,015,706

Government control of the distribution of gasoline went into effect in 1973. In 1979, for example, under the Department of Energy (DOE) special allocation program APMI was only allowed to supply Midwest with approximately fifty to sixty percent of its pre-control allocation. By June, 1980, however, APMI was again able to supply Midwest with one hundred percent of its pre-control allocation. With the lifting of government controls the gasoline market became extremely competitive in the St. Louis area.
11. Under the terms of the JSC, Midwest agreed to purchase a minimum of twelve million gallons per year. Prior to 1973, Midwest purchased between four and five million gallons per month from APMI. At no time did Midwest purchase less than the required twelve million gallons per year.
12. Following the lifting of government regulations, APMI began a review of all its jobbers. The reviews were conducted at least one hundred and twenty days prior to the date when a jobber's contract was up for renewal. APMI would examine principally the quantity of gasoline purchased from both APMI and from other sources, the credit history and the location of the jobber.
13. During 1980 and 1981, Midwest purchased gasoline from other suppliers in addition to its purchases under the JSC. In 1980, Midwest purchased a total of 50,615,405 gallons of gasoline. Of that amount, 28,414,719 gallons (57%) were purchased from APMI and 22,200,686 gallons (43%) were purchased from other suppliers. For the period from January through August, 1981, Midwest purchased a total of 35,605,164 gallons of gasoline. Of that amount, Midwest purchased 8,015,706 gallons (23%) *819 from APMI and 27,589,458 gallons (77%) from other suppliers. This information was reflected in APMI's reports of monthly sales, which were reviewed by members of APMI's distributor sales group.
14. During the period from mid 1980 through 1981, the parties' relationship deteriorated. APMI was unhappy with the small amount of gasoline Midwest was purchasing from APMI. Midwest, at the same time, was dissatisfied with the price charged by APMI for gasoline. On several occasions, representatives of Midwest informed APMI that it considered APMI's prices to be too high. Mr. Bernard Levin, Midwest's vice president in charge of operations, testified at trial that under APMI's then current pricing structure and the competitive market conditions, Midwest could not break even with APMI's product.
15. In a letter dated May 1, 1981, APMI's president, Robert C. Low, proposed a mutual cancellation of the JSC. Midwest refused to agree to a mutual cancellation of the JSC and informed APMI that it would continue to draw one million gallons per month to comply with the JSC and to cover credit card purchases. Midwest's percentage of credit card sales to net sales had been eighteen to twenty-five percent. As a result of Midwest's purchasing policy, during the latter half of 1980 and through mid 1981, the percentage of credit card sales to net sales had increased to between forty-five and seventy-nine percent.
16. During subsequent negotiations between the parties, APMI suggested the following changes to the JSC: a surcharge on credit card sales; limited de-branding; or a minimum monthly purchase of two million gallons of gasoline from APMI. Midwest rejected APMI's proposed changes to the JSC and counterproposed an extension to April 15, 1982 of the proposed termination/nonrenewal date of January 15, 1982. In a letter to APMI, Mr. Bernard Levin, Vice-President of Midwest, stated that Midwest was planning to reduce its branded Fina stations by approximately sixty percent and that Midwest needed the extension to cover the transition. APMI rejected Midwest's proposal of an extension.
17. In July, Mr. Bernard Levin met with APMI representatives in Dallas to discuss the status of their relationship. Following the Dallas meeting, Mr. Levin, in a letter to APMI representative Mr. William Frank dated July 22, 1981, acknowledged that the business relationship had deteriorated to the point that cancellation of the JSC was definite. Mr. Levin requested APMI to give Midwest early notice so that Midwest could begin de-branding.
18. In July, August and September, 1981, APMI informed Midwest of its intention not to renew the JSC for the reason that APMI had determined that a renewal of the francise relationship would be uneconomical. The JSC was due to expire at midnight on January 14, 1982.[5]
19. Beginning in September, 1981 and continuing through the fall of 1981, Midwest discussed with several other suppliers, including Sun Refining and Marketing Co. (SUNOCO), the sale of petroleum products to Midwest. On November 2, 1981, Midwest entered into a supply contract with Sun Refining and Marketing Co. Midwest continued, however, to purchase gasoline from APMI until January 14, 1982.
20. In response to APMI's notification of termination of the JSC, Midwest informed APMI by letter, dated November 17, 1981, of its position that under the PMPA, all leases were cancelled with the termination of the JSC and that, in addition, the PMPA required APMI to offer the prime leases to Midwest. Midwest then asked that the prime leases for the South Florissant station, Lindbergh station and Fenton station be assigned to Midwest. With respect to the Airport station, which APMI owned, Midwest informed APMI of its obligation under the PMPA to make a bona fide offer to sell or assign its interest *820 in the premises to Midwest. Midwest further indicated that it considered the other leases terminated and directed APMI to make arrangements directly with those dealers. A second letter, dated December 4, 1981, again outlined Midwest's position with respect to the leases and subleases.
21. In a letter dated November 30, 1981, APMI demanded that Midwest honor all existing leases despite the termination of the JSC.
22. There is no dispute that APMI made no offer to sell, transfer or assign its interest in the Airport station or assign any of the 11 subleases to Midwest.
23. During the period from August to December 1981, APMI representative Mr. R.E. Timmerman met with representatives of Ramsco Oil Co. and Ray Oil Co. on several occasions to discuss the possibility of these companies assuming ten of the Fina units that were currently being operated by Midwest.
24. As of January 14, 1982, the subleases for the Halls Ferry station, the Lindbergh station, the Page station, the Woodson station, the Gravois station, the Lemay station, the Mount Vernon station, the California station, the Fenton station, the South Florissant station and the Manchester station as well as the lease for the Airport station between APMI and Midwest were in effect.
25. Effective January 15, 1982, APMI ceased to sell gasoline to Midwest.
26. Midwest paid rent on, and continued to operate, the Airport station from January 15, 1982 to March 31, 1982. Possession of the Airport station was surrendered to APMI on April 1, 1982. The Airport station was subsequently leased to, and operated by, Bonafide Oil Company.
27. Midwest continued to pay rent and property taxes for the Lindbergh station and the South Florissant station from and after January 15, 1982, and continues to operate those stations. APMI has accepted and continues to accept rent for those stations. Midwest continued to operate and pay rent on the Fenton station until June 30, 1985.
28. Midwest continued to rent and operate the Mount Vernon station from January 15, 1982 to June 23, 1983. On June 23, 1983, APMI and Midwest entered into a mutual cancellation of the lease for the Mount Vernon station.
29. After January 15, 1982 Midwest did not operate or supply gasoline to or pay rent on the Woodson, Page, Halls Ferry, Gravois, Lemay, Manchester or California stations.
30. On December 31, 1983, Midwest was issued insurance policies with an expiration date of September 30, 1986, for general liability, automobile liability and property insurance for the Lindbergh station, the South Florissant station, the Fenton station, the Gravois station, the Lemay station, the Halls Ferry station and the Woodson station.
31. Midwest accepted three rent payments from the independent dealer of the Woodson station following the termination of the JSC. These payments were ultimately tendered to APMI. APMI has accepted monthly rent checks for the Page station from E & H Auto Sales since August, 1982.

CONCLUSIONS OF LAW
The PMPA confers upon a franchisee a right of action in federal court if a franchisor fails to comply with the requirements of the Act governing termination or nonrenewal of the franchise relationship. 15 U.S.C. § 2805.
The Court, in a prior order, found that a franchise relationship existed and that the relationship was terminated by APMI. See Midwest Petroleum Co. v. American Petrofina, Inc., 603 F.Supp. at 1121-24. Under the statute, the franchisor now has the burden of establishing as an affirmative defense that the termination was permitted by the Act. 15 U.S.C. § 2805(c).
The first issue to be decided is whether APMI's decision not to renew the JSC violated the PMPA. Section 2802(b)(3)(D)(i)(IV) *821 permits nonrenewal of a franchise when,[6]
renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee.
In considering the conduct of APMI, the Court is aided by the committee report on the PMPA. The committee specifically rejected the "reasonable business judgment" standard in favor of a twofold test. The committee stated the test as follows:
One test is whether the determination was made "in good faith". This good faith test is meant to preclude sham terminations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself.
S.Rep. No. 731, 95th Cong. 37 reprinted in 1978 U.S.Code Cong. and Ad. News 873, 896.
In applying the Act, the Court must consider the purpose of the statute. In enacting the PMPA, Congress sought to protect franchisees from arbitrary and discriminatory termination or nonrenewal of the franchise.[7]Roberts v. Amoco Oil Co., 740 F.2d 602, 605 (8th Cir.1984). It is clear, however, from both the legislative history and the statute itself, that the Act recognizes the legitimate needs of a franchisor to terminate a franchise under certain conditions. In the case at bar, APMI alleges that such a condition existed between it and Midwest. APMI claims that it had determined in good faith and in the normal course of business that the relationship was uneconomical and that Midwest refused reasonable changes to the agreement. See § 2802(b)(3)(D)(i)(IV). The Court finds that defendant has carried its burden with respect to this issue and, therefore, APMI's nonrenewal of the JSC did not violate the PMPA.
From the evidence adduced at trial, it is clear that during the 1970's, there were periods of gas shortages and that Midwest was forced  even encouraged  by APMI to purchase gas from other sources. See Findings of Fact No. 11. Following the era of gas shortages, and the removal of government regulations in January, 1981, APMI was able to offer more volume to Midwest. Midwest, however, was reluctant *822 to increase its purchases from APMI. APMI's gasoline, because of the company's marketing strategy and costs of operating a branded program, was more expensive than gasoline that could be obtained from independent dealers. Midwest informed APMI of this fact. See Findings of Fact No. 14. Accordingly, Midwest adopted a policy of purchasing only one million gallons of gasoline a month, enough gasoline to cover its credit card purchases and comply with the JSC. See Findings of Fact Nos. 11 and 15. Midwest purchased the remainder of its product from nonbranded independent dealers.
Midwest's purchasing policy caused several difficulties for APMI. First, Midwest's sporadic purchases made it difficult for APMI to arrange for delivery of product through the Gulf terminal. In order to utilize the exchange agreement with Gulf Oil Company effectively, it was necessary for APMI to inform Gulf several months in advance of its needs for its jobbers. See Findings of Fact No. 8. Accordingly, Midwest's erratic purchasing plan made it difficult for APMI to anticipate its needs.
APMI's second concern was the substantial cost of the credit card service.[8] Under Midwest's policy of purchasing only enough gasoline to cover credit card sales, the financial burden of providing the service to Midwest became significant. Midwest rejected APMI's proposal for a credit card surcharge to correct this problem. See Findings of Fact No. 16. In view principally of these two concerns, APMI began to seek either changes to the relationship or mutual termination. See Findings of Fact Nos. 15 and 16. When such efforts were unsuccessful, APMI provided Midwest with notice that the JSC would not be renewed.[9]
As previously noted, Congress provided for termination by the franchisor on the grounds that the franchise relationship is uneconomical, if such decision was made in good faith and in a normal course of business. In adopting such a test, however, Congress specifically sought to avoid second guessing the business judgments of franchisors. Brach, 677 F.2d at 1222; Siecko v. Amerada Hess Corp., 569 F.Supp. 768, 772 (E.D.Pa.1983). In evaluating the franchisor's decisions, the courts have generally only required a "good heart", or subjective good faith on the part of the franchisor. See Roberts, 740 F.2d at 606; Palmieri v. Mobil Oil Corp., 529 F.Supp. 506, 511 (D.Conn.), aff'd., 682 F.2d 295 (2d Cir.1982) ("[T]he PMPA was intended by Congress to protect franchisees only in situations where the franchisor acts with evil motive or discriminates selectively against franchisees with the intent to terminate or to nonrenew the franchise."). Congress did not enact the PMPA to provide a basis for re-examining legitimate business decisions of the franchisor. Baldauf v. Amoco Oil Co., 553 F.Supp. 408, 412 (W.D.Mich.1981), aff'd., 700 F.2d 326 (6th Cir.1983). From the evidence adduced at trial, the Court finds that APMI's decision not to renew the JSC met both prongs of the test. During 1973, the federal government took over supervision of the gas market. During that period, federal regulations prevented a franchisor from terminating a JSC. Following the lifting of government controls, APMI conducted a complete review of its jobbers. APMI analyzed each jobber with respect to the *823 amount of gas sold, the credit history, and the amount of gas purchased by the jobber from other sources. Following the review, APMI terminated a number of jobbers, including Midwest. There is no evidence to dispute or disprove APMI's contention that all jobbers were evaluated the same way. Nor is there any evidence to indicate that Midwest was being discriminated against by APMI.
Midwest's principal argument is that the failure to conduct a specific profitability determination of the Midwest JSC prior to termination constitutes a violation of PMPA. Midwest further argues that the finding by APMI that the JSC was uneconomical was a sham and that the real motive for APMI's conduct was to force Midwest to purchase more product from APMI. The Court cannot agree. It is clear from the evidence that APMI did not compute the exact profit figure for the Midwest JSC. The lack of such computations, however, does not necessitate a finding that the decision to terminate was pretextual. The Court recognizes the complexity of such business decisions. The PMPA was drafted in such a way as to give deference to the legitimate business decisions of franchisors. Brach, 677 F.2d at 1223; Munno v. Amoco Oil Co., 488 F.Supp. 1114, 1120 (D.Conn.1980). The Court is satisfied that APMI's finding that the JSC was uneconomical was not arbitrary or discriminatory.
The Court also rejects Midwest's argument that making a profit, whether large or small, precludes a determination by a franchisor that a franchise arrangement is uneconomical. Congress did not establish profitability as the test for deciding if a termination was proper under the PMPA. The Committee's report on the PMPA makes clear that:
With respect to a determination that renewal of the franchise relationship is likely to be uneconomical to the franchisor, the statutory test does not focus narrowly on whatever renewal is likely to be "unprofitable". Rather, the statutory test is whether renewal of the franchise relationship is likely to uneconomical. This standard is utilized to permit consideration of profitability in a broad economic sense. Thus, a franchise relationship which would return a net profit of $1.00 per year to the franchisor might be profitable in an absolute sense. Nevertheless, considering the investment of the franchisor in the facility, renewal of the franchise relationship might not be economically justified. In addition, any evaluation of the economics of renewal must be made in view of changes in the terms or conditions of the franchise agreement which may be acceptable to the franchisee.
S.Rep. No. 731, 95th Cong. 36-37, reprinted in 1978 U.S. Code Cong. and Ad. News 873, 895. Other factors, such as credit card costs and exchange agreements, are properly considered when a franchisor makes a determination whether or not a JSC is economical. In this regard, the Court finds that APMI has demonstrated that its decision to terminate the Midwest JSC was in compliance with § 2802(b)(3)(D) of the PMPA.
In addition to the non-arbitrary and non-discriminatory treatment demonstrated by APMI, the Court also finds that APMI offered several changes to the JSC. See Findings of Fact No. 16. In response to these offers, Midwest's only counterproposal was simply an extension of the JSC. APMI, having found the present relationship to be uneconomical, rejected Midwest's proposal to maintain the status quo for several additional months.
From the evidence adduced at trial, it is clear to the Court that Midwest was not overly concerned with the loss of its JSC with APMI. There was, at the time, enough gasoline for all the retailers in the St. Louis area. Midwest was having no difficulty purchasing sufficient quantity at a cheaper price from unbranded independents. Under its purchasing strategy, Midwest was able to keep the Fina brand name and its benefits while at the same time avoiding the additional costs associated with the branded program. Moreover, *824 once notified of APMI's proposed termination, Midwest was quickly able to arrange another JSC to sell product under the SUNOCO name. See Findings of Fact No. 19. While Midwest's actions to minimize any loss would not prohibit a finding of liability, the ability to find another branded seller quickly understandably lessened Midwest's concern with APMI's proposed termination and, thus, lessened its concern with working out suitable arrangements with APMI.
The second issue for resolution concerns whether Midwest, through its affirmative acts, waived its rights to assert that the leases and subleases were terminated with the cancellation of the JSC. As the Court previously stated:
Waiver is the intentional relinquishment of a known right. Grebing v. First Nat'l Bank of Cape Girardeau, 613 S.W.2d 872, 876 (Mo.App.1981). Absent the requisite intent there can be no waiver. Intent can be implied from conduct, but in order to do so "there must be a clear, unequivocal and decisive act implying the intent and the implication must be so consistent with an intention to waive that no other reasonable explanation is possible." Id. See also United Missouri Bank South v. Cole, 597 S.W.2d 209, 211 (Mo.App.1980); Kroh Brothers Development Co. v. State Line Eighty-Nine, Inc., 506 S.W.2d 4, 12 (Mo. App.1974) (and cases cited therein); Berger v. McBride & Son Builders, Inc., 447 S.W.2d 18, 20 (Mo.App.1969). Moreover, the Kroh case, supra, makes it clear that "[f]orebearance is not a waiver." 506 S.W.2d at 12. See also Cole, supra, 597 S.W.2d at 212.
Midwest Petroleum Co. v. American Petrofina, Inc., 603 F.Supp. at 1114.
APMI takes the position that Midwest's conduct of continuing to operate four of the stations, accepting rent on a fifth and insuring four others, constitutes a waiver of its right to assert that all the leases were terminated. The Court cannot agree.
Following APMI's notice of cancellation, and prior to the effective date of termination, Midwest informed APMI of its position that APMI was obligated under the PMPA to offer the prime leases to Midwest. See Findings of Fact No. 20. The Court found, in its prior order, that APMI violated the PMPA by not offering Midwest the prime leases as required by § 2802(b)(3)(D)(iii). Midwest Petroleum Co. v. American Petrofina, Inc., 603 F.Supp. at 1124. The clear implication is that had APMI complied with the PMPA, Midwest would have only sought to maintain leases for those stations which they did in fact continue to operate. Because Midwest informed APMI that they considered the other leases terminated, the Court finds no waiver of Midwest's right to assert such termination by the exercise of its right to continue to operate several other stations.
Nor does the Court find it significant that Midwest purchased insurance for several of the stations. Midwest was understandably prudent to continue to insure the property despite its contention that it was no longer a lessee of the property. Midwest further explained that the insurance coverage was purchased for several stations at one time. In this case the policy, purchased in December 1981, covered seven stations, in four of which Midwest claims it no longer had an interest after January 14, 1982. See Findings of Fact No. 30. Furthermore, the Court finds no evidence to indicate that APMI was misled with respect to Midwest's abandonment of the other stations. Midwest specifically informed APMI of its intention to continue to operate the Airport, Mount Vernon, South Florissant, Lindbergh and Fenton stations. See Findings of Fact No. 20. Under the PMPA, Midwest is afforded the opportunity to accept some of the leases while terminating others.[10] Accordingly, the Court *825 finds no waiver of Midwest's right to assert that any or all the leases were terminated as of midnight, January 14, 1982.
In summary, the Court finds that APMI's decision to terminate the JSC with Midwest did not violate the PMPA. APMI's decision not to make a bonafide offer of sale for the Airport station, however, did violate the PMPA. Further, the Court finds that, as of midnight, January 14, 1982, all leases under the JSC were terminated. Midwest's acts of continuing to operate the Airport, Mount Vernon, South Florissant, Lindbergh and Fenton stations were consistent with its rights under the PMPA. Accordingly, Midwest is not barred from asserting that the other subleases were terminated as of midnight, January 14, 1985. The Court will schedule a trial on the issue of damages at a later date.
NOTES
[1] Originally, the contract was entered into with American Petrofina Co. of Texas (APCOT). APCOT refined and sold petroleum. APCOT was one of two parent corporations of APMI. In an instrument dated December 20, 1979, APCOT assigned the JSC to APMI. On July 1, 1985, APMI was merged into APCOT and APCOT changed its name to Fina Oil and Chemical Company. For purposes of this Memorandum, the Court will refer to both APMI and its predecessor APCOT as APMI.
[2] Such agreements are common in the industry. The agreement allows APMI's jobbers to draw petroleum at a terminal other than one owned by APMI. Under the agreement with Gulf, in exchange for this service, APMI would allow Gulf's jobbers to use APMI's terminals at other locations.
[3] The eleven stations are as follows: the Manchester station (in Pond, Mo.); the Mount Vernon station (2nd and Broadway, Mount Vernon, Ill.); the South Florissant station (1617 S. Florissant); the Fenton station (1069 Gravois, Fenton, Mo.); the California station (3655 California St.); the Lindbergh station (7001 S. Lindbergh); the Halls Ferry station (9855 Halls Ferry); the Gravois station (8455 Gravois); the Lemay station (1310 Lemay); the Woodson station (2815 Woodson); and the Page station (6525 Page). The latter six stations (Lindbergh, Halls Ferry, Gravois, Lemay, Woodson and Page) are referred to by the parties as the Fisher-Fleet stations.
[4] The two stations leased directly from APMI (or its predecessor APCOT) are the Danville station (I-70 and Hwy. 161) and the Airport station (I-70 and Natural Bridge Road). The Danville lease was mutually cancelled, effective August 31, 1981. Midwest's lease on the Airport station expired March 31, 1982. APMI rejected an offer by Midwest, in November, 1981, to purchase the Airport station for $100,000.00.
[*] For the period January through August.
[5] A separate notice of cancellation of the Airport station lease was sent on October 13, 1981. The Airport lease was due to expire on March 31, 1982 and APMI informed Midwest of its intention not to renew the lease.
[6] Section 2802(b)(3)(D) is applicable to franchises "entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), ...." In the case at bar, as of June 19, 1978, the JSC was being renewed annually pursuant to an automatic renewal provision. While at least one court has indicated in an unpublished opinion that such a provision satisfies the three year requirement, see Hooper Oil Company, Inc. v. American Petrofina Marketing, Inc., 720 F.2d 1289 (5th Cir.1983), the Court in this case is not required to rely on JSC to satisfy the requirements of § 2802(b)(3)(D). The underlying leases and subleases, with the exception of the Danville station, which is not at issue in this case, were for periods ranging from five to fifteen years and met the requirements of § 2802(b)(3)(D). See generally Brach v. Amoco Oil Co., 677 F.2d 1213 (7th Cir.1982); Brown v. American Petrofina Marketing, Inc., 555 F.Supp. 1327, 1333 (M.D.Fla.1983).
[7] In Brach v. Amoco Oil Co., 677 F.2d 1213, 1216 (7th Cir.1982), the court stated:

Congress designed the PMPA to allay three specific concerns: that franchisee independence may be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power may result in franchise agreements that amount to contracts of adhesion; and that termination or nonrenewal may disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one.
See S.Rep. No. 95-731, 95th Cong., 2d Sess. 15, reprinted in (1978) U.S. Code Cong. & Ad.News 873, 875-77.
[8] APMI alleges that Midwest had $9,753,620.00 in Fina credit sales and APMI incurred $395,021.00 in costs in providing the service to Midwest. For the period from January to August, 1981, Midwest had $4,783,343.00 in credit sales and APMI incurred $203,769.00 in costs. While Midwest disputes these figures, it is not necessary for the Court to determine the exact cost of the credit card service. It is sufficient for purposes of the Court's analysis to recognize that more than a de minimus cost is incurred by APMI in connection with the credit card service.
[9] APMI delivered to Midwest a letter dated August 21, 1981 which notified Midwest that APMI had determined that a renewal of the contractual relationship would be uneconomical and, therefore, that the contract would be terminated and cancelled effective midnight January 14, 1981. There is no claim by Midwest that adequate notice of the cancellation was not provided.
[10] The Court rejects APMI's assertion that Midwest's continued operation of one of the Fisher Fleet stations requires a finding that Midwest waived the right to claim termination of the subleases for the other five Fisher Fleet stations. While the six stations were leased, then subleased simultaneously, there are separate leases for each station. In addition, Midwest specifically informed APMI of its intention to continue to operate only the Lindbergh station.