644 F.Supp. 1067 (1986)
MIDWEST PETROLEUM COMPANY, Plaintiff,
v.
AMERICAN PETROFINA MARKETING, INC., Defendant.
No. 83-93C(1).
United States District Court, E.D. Missouri, E.D.
October 3, 1986.
*1068 *1069 James P. Tierney, Alfred R. Hupp, Jr., Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., Paul Brackman, Thomas G. Brackman, Brackman, Copeland, Oetting, Copeland, Walther & Schmidt, Clayton, Mo. (local counsel), for plaintiff.
Kenneth R. Heineman, Ellen E. Bonacorsi, Coburn, Croft & Putzell, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This case arises out of the cancellation of a Jobber Sales Contract (JSC) to sell petroleum.[1] The Court bifurcated the damage issues. On June 30, 1986, the Court commenced a two day hearing wherein the damage issues were tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. DEPARTMENT OF ENERGY (DOE) CONSENT ORDER PAYMENTS
In 1982, defendant withheld $109,502.56 in payments which were to be made to Midwest by defendant as a result of a Consent Order executed in 1982 with the United States Department of Energy. Defendant claimed that the amounts deducted from the payments represented accrued and unpaid rent on the five Fisher Fleet stations. The Court, after a trial on the merits, found that the leases on the five Fisher Fleet stations were terminated with *1070 the cancellation of the JSC. Accordingly, Midwest is entitled to the withheld payments in the amount of $109,502.56. Furthermore, the Court finds that Midwest is entitled to prejudgment interest on the amount withheld at the rate of nine percent per annum.
The decision to award prejudgment interest is within the discretion of the trial court. See Waterside Ocean Navigation Co. v. International Navigation, Ltd., 737 F.2d 150, 159 (2d Cir.1984); Bricklayers' Pension Trust Fund v. Taiaroil, 671 F.2d 988, 990 (6th Cir.1982); Washington v. Kroger Co., 671 F.2d 1072, 1078 (8th Cir.1982); Orshan v. Macchiarola, 105 F.R.D. 534, 540-41 (E.D.N.Y.1985); United States v. Northeastern Pharmaceutical and Chemical Co., Inc., 579 F.Supp. 823, 852 (W.D.Mo.1984). Prejudgment interest is compensatory, not punitive, in nature. The rate should be that which compensates plaintiff for the deprivation of the use of the missing funds. In light of these considerations, the Court finds that prejudgment interest calculated at the rate of nine percent per annum will adequately compensate plaintiff. See Hollenbeck v. Falstaff Brewing Corp., 605 F.Supp. 421, 435 (E.D.Mo.1984), aff'd 780 F.2d 20 (8th Cir.1985).

B. LOST PROFITS AND APPRECIATION
In a prior decision, the Court found that APMI violated the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq. (1982), by not offering Midwest APMI's interest in the Airport site as required by § 2802(b)(3)(D)(iii). See Midwest Petroleum Co., 603 F.Supp. at 1121-23. Midwest is not seeking an injunction directing APMI to make a bonafide offer to sell its interest in the Airport site.[2] Instead, Midwest is seeking lost profits as a result of APMI's failure to comply with the requirements of the PMPA.
Despite the lack of prior case law in the area of damages under the PMPA, the Court has no doubt that lost profits are recoverable under these circumstances. See Thompson v. Kerr-McGee Refining Corp., 660 F.2d 1380, 1388 (10th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982) (franchisee's evidence of his average income from the operation of the franchised gas station was sufficient to support the jury's verdict). See also Comment, Retail Gasoline Franchise Terminations and Non-Renewals Under Title I of the Petroleum Marketing Practices Act, 1980 Duke L.J. 522, 535. The ability to recover lost profits depends on the plaintiff's ability sufficiently to substantiate its claim. As the Eighth Circuit stated:
To warrant a recovery for lost profits, the plaintiff must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts. [Fireside Marshmallow Co. v. Frank Quinlan Construction Co., 213 F.2d 16, 18 (8th Cir.1954)], 22 Am.Jur.2d Damages § 171, at 422-25. As an element of recoverable damages, the sufficiency of the evidence of lost profits is dependent upon whether the financial information contained in the record is such that a just or reasonable estimate can be drawn. Rich v. Eastman Kodak Co., 583 F.2d 435, 437 (8th Cir.1978) (per curiam); Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846, 855 (8th Cir.), cert. denied, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952).
Cargill, Inc. v. Taylor Towing Service, Inc., 642 F.2d 239, 241 (8th Cir.1981).
During the hearing on the damage issues, plaintiff sought to demonstrate to the Court that its lost profits from the loss of the Airport site were on the order of $10,000.00 to $11,000.00 per month. During the trial, for the first time plaintiff took the position that had APMI sold Midwest the station in 1981, Midwest would have *1071 leveled the site and constructed a combined convenience store/self service station on the location. While the Court is aware that many stations have adopted this marketing strategy, Midwest's presentation of its damages based on this plan are conjectural, speculative and unfounded. The only evidence Midwest produced was the testimony of Mr. Bernard Levin, Midwest's Vice President in charge of operations, who stated that similar operations returned profits in the $10,000-$11,000 range. Midwest produced no supporting data; neither did it indicate adjustments to its estimates to reflect the costs of converting the property. Clearly, APMI was handicapped in its efforts to challenge Mr. Levin's estimates by this total lack of supporting documentation. Accordingly, the Court must reject Midwest's profit estimations based upon the convenience store/self service station conversion.
The Court does find, however, that Midwest has demonstrated lost profits of $1,500.00 per month arising from the failure of APMI to make a bonafide offer to sell the station as required by the PMPA. This amount was disclosed to APMI in Midwest's Supplemental Answers to Defendant's Interrogatories, filed January 19, 1984. Midwest stated that it based the profit figure on its estimate of the average gross profit per gallon sold multiplied by its estimate of the gallons it would have sold monthly at the Airport site. During the hearing, defendant was provided every opportunity to cross-examine Mr. Levin and to expose any inconsistencies, inadequacies and inaccuracies in plaintiff's estimate of the monthly lost profit figure. See generally, Jay Edward, Inc. v. New England Toyota Distributor, 708 F.2d 814 (1st Cir. 1983), cert. denied, 464 U.S. 894 (1983); Kingsport Motors, Inc. v. Chrysler Motor Corp., 644 F.2d 566 (6th Cir.1981). As a result of defendant's failure to mount a credible attack on the plaintiff's estimation of its lost profits, the Court finds that lost profits of $1,500.00 are reasonable for the Airport site.
In awarding damages for lost profits, the Court must also decide the length of time for which plaintiff is entitled to receive lost profits. The particular facts of this case provide for a relatively easy determination of this issue. It is undisputed that Midwest's occupation of the Airport site ended on April 1, 1982. It is also undisputed that approximately one year later, in March 1983, Midwest commenced selling gasoline to the Airport station as a Jobber. On March 28, 1985, Midwest signed a sublease with Missouri Terminal Oil Co. for a period of three years, allowing Midwest to operate the station until March 31, 1988. During the damage hearing, Midwest did not attempt to demonstrate how these facts fail to mitigate the amount of damages it is seeking in lost profits. To allow Midwest to recover for lost profits, when in fact it is in possession of and doing business from the Airport station, would provide Midwest with a double recovery. Accordingly, the Court will only award Midwest lost profits from the Airport site for the period from April 1, 1982 through March 31, 1983. This results in an award of lost profits of $18,000.00.[3]
As a final matter, with respect to the Airport station, Midwest asserts that it is entitled to damages for lost appreciation on the Airport station. The Court finds that plaintiff failed at the damage hearing to adequately demonstrate the amount of damages in lost appreciation suffered as a result of defendant's failure to offer the Airport station to Midwest. Plaintiff offered only the testimony of Mr. Levin who *1072 simply asserted the station's present value was $300,000.00. The lack of any supporting evidence handicapped defendant's cross-examination of Mr. Levin on his estimation. The failure of plaintiff to establish the amount of damages to a reasonable degree of certainty is fatal to its claim for recovery. Accordingly, plaintiff's claim for lost appreciation on the Airport site will be denied.

C. MIDWEST'S CLAIM FOR EXEMPLARY DAMAGES
Section 2805(d)(1)(B) states that a prevailing franchisee shall be entitled "in the case of any such action which is based upon conduct of the franchisor which was in willful disregard of the requirements of section 2802 or 2803 of this title, or the rights of the franchisee thereunder, to exemplary damages, where appropriate." Midwest argues that the failure of APMI to make a bonafide offer of sale to Midwest for the Airport station was willful and thus deserving of exemplary damages. The Court does not agree. It is undisputed that APMI never made Midwest an offer to purchase the Airport site. It was APMI's position at the outset that it was not required to offer the property to Midwest because the PMPA was inapplicable to the relationship between the two parties. The litigation presented numerous novel questions of law which were ultimately decided in a manner that undercut APMI's initial position. In light of the paucity of case law interpreting the PMPA and the difficulty of the issues in this case, the Court cannot say that defendant's actions manifested a "willful disregard" of the requirements of the PMPA or plaintiff's rights thereunder such that exemplary damages would be appropriate. Accordingly, plaintiff's request for exemplary damages is denied.

D. BERNARD LEVIN'S CLAIM FOR LOST TIME
Mr. Levin, Midwest's Vice President in charge of operations, seeks $10,000.00 to reimburse him for time he alleges he was forced to spend away from his normal duties as a result of the conduct of defendant. Mr. Levin has produced no time records in support of his claim. The Court will not award damages based on a guess by Mr. Levin of how much of his time was diverted from his normal duties. Moreover, the Court finds that this kind of diversion of time is merely a part of doing business and as such is not a compensable cost under any theory of damages. Accordingly, Mr. Levin's claim for $10,000.00 is denied.

E. MIDWEST'S CLAIM FOR ATTORNEY'S FEES
Section 2805(d)(1)(C) provides that the prevailing franchisee shall be entitled to reasonable attorney's fees. Plaintiff's attorneys have filed affidavits and supporting documents seeking a total of $198,978.60 in attorney's fees.[4] In deciding upon an appropriate award of attorney's fees, the Court must first consider the reasonableness of plaintiff's petition. As previously noted, the combined hours of plaintiff's two law firms is less than one-half the number of hours expended by defendant's firm. In addition, the Court is impressed with the detail of Mr. Tierney's itemization of the legal services rendered in this case. Upon review of the itemization, the Court finds the hours expended to be reasonable and the petition to be of sufficient specificity to allow for an adequate review. Accordingly, the Court is convinced that the petition is not excessive for this type of case. This does not mean, however, that plaintiff is entitled to recover *1073 all its attorney's fees; rather the amount should be reduced to reflect the fact that plaintiff prevailed on only some of the issues. In particular, the Court notes that Midwest did not prevail on the issues of permissibility of APMI's conduct in not renewing the JSC, the jurisdiction question concerning American Petrofina Incorporated and several damage claims, including the issue of exemplary damages decided above. The Court is convinced that allowing only recovery of attorney's fees in proportion to the number of issues on which plaintiff was the prevailing party is in keeping with the purpose and spirit of the PMPA. Accordingly, the Court finds that plaintiff is entitled to recover two-thirds, or $132,652.40, in attorney's fees from defendant. It is the Court's opinion that this amount adequately compensates plaintiff's attorneys for their work on the issues on which plaintiff was the prevailing party.

F. APMI'S CLAIM FOR SET-OFF DAMAGES
APMI seeks approximately $146,522.00 in damages to the five Fisher Fleet stations pursuant to the sublease agreements between the parties. The subleases provided in pertinent part as follows:
4. Lessee [Midwest] covenants and agrees as follows:
(a) That Lessee has inspected the Leased Premises, and finds same in good order and repair, and Lessee agrees to take good care of the Leased Premises and to suffer no waste thereto, and at the end or other expiration of the term of this Lease to deliver Leased Premises to Lessor in as good a state and condition as received by Lessee, reasonable wear and tear excepted.
During the damage hearing, APMI sought to demonstrate damage to the five stations beyond the normal wear and tear which was allowed under the lease.[5]
Upon review of all the evidence, the Court finds that APMI has failed to prove any damages beyond normal wear and tear. As an initial matter, the Court notes that at the time the stations were subleased to Midwest in 1971, many had been in operation for a number of years. The Lemay station was over thirty years old and the Gravois and Page stations were over twenty years old. The buildings on each site are very small, there is little storage space and the equipment in place at the time of execution of the sublease was all used. The Court credits the testimony of Mr. Barth, who, while employed by Bona Fide Oil Company in 1982, was asked by APMI to lease the stations following the departure of Midwest. Mr. Barth testified that as of April 1982, he estimated that it would cost approximately $5,000.00 to clean up the stations to an operating condition, with the exception of the car wash at the Halls Ferry station which had been severely vandalized. Upon review of the evidence, the Court is in agreement with Mr. Barth's opinion that these expenses would be necessary only to repair the normal wear and tear condition of these stations.[6]
APMI argues that it was required to pay $240,000.00 to the Fishers (APMI's lessor) as a result of the condition of the five Fisher Fleet stations. This fact is of no consequence. Some of the stations have been abandoned for several years while responsibility for their upkeep, taxes, etc. has been in dispute. In their abandoned *1074 condition, the premises were subject to severe vandalism, especially the car wash at the Halls Ferry station. However, in a prior decision, the Court found that the five Fisher Fleet subleases were terminated as of January 15, 1982. APMI has failed to demonstrate any damage as of that date beyond normal wear and tear as a result of Midwest's occupation. Accordingly, APMI's claim for set off damages and for attorney's fees incurred in connection with the claim for set off damages must be denied.
NOTES
[1] The facts in this case are set out in more detail in the Court's prior two opinions. See Midwest Petroleum Co. v. American Petrofina, Inc., 603 F.Supp. 1099 (E.D.Mo.1985); Midwest Petroleum Co. v. American Petrofina, Inc., 635 F.Supp. 815 (E.D.Mo.1986).
[2] It is undisputed that in November, 1981, Midwest offered APMI $100,000.00 for the Airport site and delivered to defendant a check for $10,000.00 as earnest money for the transaction. Defendant rejected Midwest's offer and the check was returned uncashed.
[3] With respect to the other stations which Midwest subleased from APMI, the Court finds plaintiff has suffered no damages. At the time the JSC was cancelled, Midwest only requested assignment of the prime leases for the South Florissant station, the Lindbergh station and the Fenton station. Following the nonrenewal of the JSC, Midwest was allowed to continue to operate those stations although not under the Fina name. See Midwest Petroleum Co., 635 F.Supp. at 819-20. Midwest has not provided any evidence that the failure of defendant to offer the prime leases for these three stations or any other station has caused any damage to Midwest.
[4] Plaintiff employed the services of two law firms in this case. Mr. Tierney of the firm Lathrop, Koontz & Norquist is requesting attorney's fees in the amount of $186,000.00. Mr. Brackman of the firm Brackman, Copeland, Oetting, Copeland, Schmidt & Stock is requesting fees in the amount of $12,978.60. The Court notes, by way of comparison, that defendant's law firm utilized the services of forty-eight different individuals, who expended in excess of 3,150 hours, resulting in a bill of over $245,000.00. Mr. Tierney's firm utilized the services of only twelve individuals, who expended a total of 1,315.75 hours on this case.
[5] APMI alleged damages in the following amounts: $93,449.00 to the Halls Ferry station; $10,000.00 to the Gravois station; $31,033.00 to the Page station; $6,500.00 to the Lemay Ferry station; and $5,540.00 to the Woodson station.
[6] The damages sought by APMI in several instances are unrealistic. For the Page station, for example, in 1971 the property was valued at $35,000.00 for improvements and $4,500.00 for the equipment. After a lease of over ten years, APMI now seeks damages of $31,033.00. During the hearing APMI suggested that Midwest was responsible for replacing the pumps at several of the sites. Midwest replaced several old, outdated pumps and, upon termination of the leases removed the pumps it installed, which was permitted under the terms of the lease. APMI's suggestion that Midwest should have returned the old pumps, which had no useful value, is unreasonable.